UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------X
UNITED STATES OF AMERICA,

    -against-

MICHAEL JOHNSON,

               Defendant.
--------------------------------X

<u>MEMORANDUM & ORDER</u>
22-CR-0494(JS)

APPEARANCES

For United States:        Catherine Mary Mirabile, Esq.
                       Samantha Alessi, Esq.
                       United States Attorney's Office
                       Eastern District of New York
                       271 Cadman Plaza East
                       Brooklyn, New York 11201

For Defendant
Michael Johnson:         Gary Matthew Kaufman, Esq.
                       Law Office of Gary Kaufman, PLLC
                       377 Broadway, 8th Floor
                       New York, New York 10013

                       Nicholas Hine, Esq.
                       Hine Law PLLC
                       P.O. Box 170096
                       Brooklyn, New York 11217

SEYBERT, District Judge:

On October 31, 2025, a jury convicted defendant Michael Johnson (hereinafter, "Johnson" or "Defendant") of conspiracy to commit sex trafficking, two counts of sex trafficking, and interstate prostitution.  Before the Court are Defendant's motions for a judgment of acquittal (hereinafter, "Acquittal Motion") or, in the alternative, for a new trial (hereinafter, "Motion for a

New Trial") (together with the Acquittal Motion, "Motions") pursuant to Federal Rules of Criminal Procedure 29 and 33, respectively.  For the reasons that follow, Johnson's Motions are DENIED.

BACKGROUND[1]

The Court presumes the parties' familiarity with the record and summarizes the facts and evidence herein only as necessary for resolution of Defendant's Motions.

I.   The Indictments[2]

On November 1, 2022, a grand jury sitting in the Eastern District of New York returned an indictment charging Johnson and others with conspiracy to commit sex trafficking in violation of 18 U.S.C. §§ 1591(a)(1) and (a)(2), along with other related charges.  (See Indictment, ECF No. 1.)

On September 11, 2025, Johnson, with co-defendants Timonthy Bullen (hereinafter, "Bullen") and Jigar Dadarwala

---

[1] The facts are recited as relevant to the Court's analysis and are drawn from the Docket, the Superseding Indictment, pre-trial proceedings, and the Trial Transcript ("Tr.").  Citations to "GX" refer to the Government's exhibits. The Court presumes the parties' familiarity with the entire record.

[2] The operative indictment is the Superseding Indictment at ECF No. 230.  However, on October 21, 2025, the Government filed a Trial Indictment which included only the charges against Johnson. (See Trial Indictment, ECF No. 257.)  The Government filed a revised Trial Indictment as to Johnson on October 31, 2025, to remove language at the end of Count One about minors under the age of 18 years old, as no evidence of that conduct was presented at trial. (See Revised Trial Indictment, ECF No. 269.)

(hereinafter, "J. Dadarwala"), were charged in a six-count Superseding Indictment for their participation in the aforementioned sex trafficking conspiracy. (See Superseding Indictment, ECF No. 230.) As relevant here, Johnson was charged with: (1) conspiracy to commit sex trafficking, in violation of 18 U.S.C. §§ 1591(a)(1) and (a)(2); (2) three counts of sex trafficking related to Dawn, Kristina and Ashley, respectively, in violation of 18 U.S.C. §§ 1591(a)(1), (a)(2) and (b)(1); and (3) interstate prostitution of Ashley, in violation of 18 U.S.C. § 2422(a).[3] (See id.)

## II.  Relevant Pre-Trial Proceedings

Co-defendants Narendarakuma Dadarwala (hereinafter, "N. Dadarwala") and Shardaben Dadarwala (hereinafter, "S. Dadarwala") (together, the "Dadarwalas") pled guilty on April 29, 2025 and are presently awaiting sentencing. (See ECF Nos. 186-189 (sealed).)

On August 5, 2025, the Court denied both Johnson's motion to dismiss the indictment and his motion to sever his case from the case of co-defendant Ashokbhai Patel (hereinafter, "Patel"). (See ECF No. 212.) On that same date, the Court also denied Patel's motion to sever his case from Johnson's case. (See ECF No. 213.) On September 3, 2025, Patel pled guilty and is currently awaiting sentencing. (See ECF Nos. 227-28.) Co-defendant J.

---

[3] The Superseding Indictment charged Johnson in Counts One through Five. (See Superseding Indictment.)

3

Dadarwala is undergoing a competency evaluation.  (See, e.g., ECF No. 288 (sealed).)  Co-defendant Bullen was also being evaluated regarding his competency, but has recently been determined "able to understand the nature and consequences of the proceedings against him and to assist properly in his defense."  (Gov't Ltr. (Mar. 31, 2026), ECF No. 298).)  Because Johnson did not plead guilty and was not undergoing a competency evaluation, the Government proceeded with the charges against him.

On October 9, 2025, Johnson was re-arraigned on the Superseding Indictment.  (See ECF No. 247.) On October 17, 2025, the Court ruled on pre-trial motions in limine, granting in part and denying in part Johnson's motions in limine, and granting the Government's motions in limine.  (See ECF No. 252.)

III. Relevant Trial Proceedings

Jury selection for Johnson's trial occurred on October 20, 2025.  (See ECF No. 256.)  The trial began the next day, October 21, 2025.  (See ECF No. 259.)  The Government presented its case over the course of approximately one week, which consisted of the testimony of eight witnesses and various physical and documentary evidence.

After the Government concluded its case in chief, on October 28, 2025, Johnson orally made his Rule 29 motion for acquittal. (Tr. 731-34.)  Johnson's arguments primarily addressed Counts Four and Five of the Superseding Indictment, which charged

4

him with sex trafficking and interstate prostitution of Ashley, who was the one victim in the charged substantive counts who did not testify at trial. (Id. 731-34.) With respect to the other counts, Johnson acknowledged the Court previously indicated its disinclination to grant a Rule 29 motion, and generally contended the evidence was insufficient. (Id. 731-32; see also id. 718, 724-25.) The Government opposed Johnson's Rule 29 motion. (Id. 732-33). The Court denied Johnson's oral motion. (Id. 734; see also id. 718, 724-25.) Following the Defendant's case-in-chief,[4] Johnson renewed his Rule 29 motion, and the Government again opposed it. (Id. 737.) The Court denied Johnson's renewed motion. (See id.)

The jury rendered its verdict on October 31, 2025, finding Johnson guilty on Counts One (Sex Trafficking Conspiracy), Two (Sex Trafficking – Dawn R.), Four (Sex Trafficking – Ashley L.) and Five (Interstate Prostitution – Ashley L.), and finding Johnson not guilty on Count Three (Sex Trafficking – Kristina D.). (See ECF No. 273.)

---

[4] The Defendant's case-in-chief consisted of defense counsel reading one stipulation into the record regarding the dates Johnson had been previously incarcerated. (See Tr. 736.)

IV.   Post-Trial Briefing

On December 15, 2025, Johnson filed his Acquittal Motion pursuant to Rule 29 and his Motion for a New Trial pursuant to Rule 33 (see Motions, ECF No. 282), accompanied by a memorandum in support of his Motions (see Support Memo, ECF No. 282-1).   On February 12, 2026, the Government filed its opposition to the Motions.  (See Opp'n, ECF No. 295.)  On February 26, 2026, Johnson filed a reply in support of his Motions.  (See Reply, ECF No. 297.)

DISCUSSION

I.   Legal Standards

A.   Rule 29, Motion for a Judgment of Acquittal

Pursuant to Federal Rule of Criminal Procedure Rule 29(a), a district court shall enter a judgment of acquittal as to "any offense for which the evidence is insufficient to sustain a conviction."  FED. R. CRIM. P. 29(a).  Rule 29(c) permits a defendant to "move for a judgment of acquittal, or renew such a motion, within 14 days after a guilty verdict or after the court discharges the jury, whichever is later."  FED. R. CRIM. P. 29(c).

"Under Rule 29, the standard is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  United States v. Kenner, No. 13-CR-0607, 2019 WL 6498699, at *3 (E.D.N.Y. Dec. 3, 2019) [hereinafter, "Kenner I"] (citation modified) (emphasis in

6

original); see also United States v. Mi Sun Cho, 713 F.3d 716, 720 (2d Cir. 2013) ("The question is 'not whether this [C]ourt believes that the evidence at trial established guilty beyond a reasonable doubt,' but rather, whether 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" (first quoting United States v. Brown, 937 F.2d 32, 35 (2d Cir. 1991); then quoting United States v. Persico, 645 F.3d 85, 105 (2d Cir. 2011))). "[V]iewing the evidence in the light most favorable to the government means drawing all inferences in the government's favor and deferring to the jury's assessments of the witnesses' credibility." Kenner I, 2019 WL 6498699, at *3 (citation modified). "Only if 'the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt' may the court enter a judgment of acquittal." United States v. Jabar, 19 F.4th 66, 76 (2d Cir. 2021) (quoting United States v. Guadagna, 183 F.3d 122, 130 (2d Cir. 1999)), cert. denied sub nom. Bowers v. United States, 142 S. Ct. 1396 (2022). The evidence must be evaluated "in conjunction" rather than by "piecemeal or in isolation." United States v. Klein, 913 F.3d 73, 78 (2d Cir. 2019); see also Guadagna, 183 F.3d at 130 (noting "each fact may gain color from others").

Further, "when evaluating the evidence under this standard, 'courts must be careful to avoid usurping the role of

7

the jury when confronted with a motion for acquittal.'" Kenner I, 2019 WL 6498699, at *3 (quoting United States v. Jackson, 335 F.3d 170, 180 (2d Cir. 2003)).  Thus, where 'either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, the court must let the jury decide the matter.'"  Jabar, 19 F.4th at 76 (citation modified) (quoting Guadagna, 183 F.3d at 129). Therefore, "[a] defendant challenging the sufficiency of the evidence 'bears a heavy burden,' and 'the standard of review is exceedingly deferential.'" United States v. Martoma, 894 F.3d 64, 72 (2d Cir. 2017) (quoting United States v. Coplan, 703 F.3d 46, 62 (2d Cir. 2012)).

B.    Rule 33, Motion for a New Trial

Federal Rule of Criminal Procedure 33(a) states, in relevant part, that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." FED. R. CRIM. P. 33(a).  "Because motions for a new trial are disfavored in this Circuit the standard for granting such a motion is strict." United States v. Gambino, 59 F.3d 353, 364 (2d Cir. 1995).  A court may, in its discretion, grant a Rule 33 motion only in "extraordinary circumstances," United States v. McCourty, 562 F.3d 458, 475 (2d Cir. 2009) (citation modified), and only if there exists "a real concern that an innocent person may have been convicted." United States v. Parkes, 497 F.3d 220, 232 (2d Cir. 2007) (quoting United States v.

Ferguson, 246 F.3d 129, 134 (2d Cir. 2001)). "The ultimate test" is whether "letting a guilty verdict stand would be a manifest injustice." Ferguson, 246 F.3d at 134. When deciding such a motion, the Court "must examine the entire case, take into account all facts and circumstances, and make an objective evaluation." Id. In doing so, the Court must "strike a balance between weighing the evidence and credibility of witnesses and not wholly usurping the role of the jury." United States v. Peters, 843 F. App'x 369, 374 (2d Cir. 2021) (quoting Ferguson, 246 F.3d at 133).

II. Analysis

A. Rule 29 Motion for a Judgment of Acquittal

Johnson seeks a judgment of acquittal pursuant to Rule 29 because he alleges the evidence was insufficient to prove he: (1) was part of the charged conspiracy to commit sex trafficking; (2) used force, fraud, or coercion to cause Dawn and Ashley to engage in commercial sex work; and (3) induced Ashley to travel in interstate commerce for the purpose of prostitution. (See Support Memo at 9-21; see also Reply at 4-11.)

1. Johnson is Not Entitled to a Judgment of Acquittal on Count One – Sex Trafficking Conspiracy in Violation of 18 U.S.C. §§ 1591(a)(1) and (a)(2)

Johnson asserts the Court should direct a verdict of acquittal of Count One of the Superseding Indictment, which charged him with sex trafficking conspiracy in violation of 18 U.S.C. §§ 1591(a)(1) and (a)(2). Johnson's overarching contention is that

9

the Government "failed to present proof that he was a member of the same single conspiracy, centered on the [Sayville Motor Lodge ("SML")], which was charged in the [S]uperseding [I]ndictment." (Support Memo at 10.)  This argument is without merit.

"The gist of conspiracy is, of course, agreement." United States v. Scott, 979 F.3d 986, 990 (2d Cir. 2020) (quoting United States v. Beech-Nut Nutrition Corp., 871 F.2d 1181, 1191 (2d Cir. 1989)).  However, "to establish the existence of a conspiracy, the government 'need not present evidence of a formal or express agreement,' and may instead rely on proof the parties had a 'tacit understanding to engage in the offense.'"  Id. (quoting United States v. Amato, 15 F.3d 230, 235 (2d Cir. 1994)). "[T]he evidence must be sufficient to permit the jury to infer that the defendant and other alleged coconspirators entered into a joint enterprise with consciousness of its general nature and extent."  Id.  (alterations in original) (quoting Beech-Nut Nutrition Corp., 871 F.2d at 1191).

Whether the Government has proved a single conspiracy or multiple conspiracies is a question of fact for a properly instructed jury.  See United States v. Khalupsky, 5 F.4th 279, 288 (2d Cir. 2021) (citation omitted).  Defendant argued in summation that the Government failed to prove a single, overarching conspiracy.  (See, e.g., Tr. 817-18.)  The Court instructed the jury on multiple conspiracies versus a single conspiracy.  (Tr.

10

880-82.)  Accordingly, the "jury heard, considered, and rejected" the argument Defendant now asserts, "and the jury's verdict may only be disturbed if, viewing all the evidence in the light most favorable to the Government and construing all possible inferences in its favor, a 'rational trier of fact could [not] have found the essential elements of the crime beyond a reasonable doubt.'" United States v. Martinez, No. 04-CR-0048, 2007 WL 1791255, at *1 (S.D.N.Y. June 18, 2007) (alteration in original) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)).

Turning to the merits, Defendant argues "the conspiracy involving the Dadarwalas, Patel, and Bullen was separate from that involving [the Defendant]" because "the owners, operators, and employees of the SML shared a common goal with [] Bullen to make the SML a profitable center for prostitution, whereas [] Johnson simply used the property, as one of many, to conduct his criminal activities."  (Support Memo at 11.) To sustain a conspiracy conviction, the Government must have proved "that two or more persons entered into a joint enterprise for an unlawful purpose, with awareness of its general nature and extent."  Khalupsky, 5 F.4th at 288 (quoting United States v. Torres, 604 F.3d 58, 65 (2d Cir. 2010)).  It must "show that each alleged member agreed to participate in what he knew to be a collective venture directed toward a common goal."  Id. (quoting United States v. Maldonado-Rivera, 922 F.2d 934, 963 (2d Cir. 1990)).  But "[t]he

11

government need not show that the defendant knew all of the details of the conspiracy," "[n]or must the government prove that the defendant knew the identities of all of the other conspirators." Id. (alterations in original) (quoting United States v. Huezo, 546 F.3d 174, 180 (2d Cir. 2008)).  This is "'especially [true] where the activity of a single person was central to the involvement of all' conspirators," and "a defendant may be a co-conspirator if he knows only one other member of the conspiracy[.]"  Id. (first alteration in original) (first quoting Maldonado-Rivera, 922 F.2d at 963; then quoting Huezo, 546 F.3d at 180).

Upon review of the record, the Court concludes that there was sufficient evidence to find that Johnson, with others, entered into an unlawful agreement to commit sex trafficking.  "The existence of a conspiracy must necessarily be determined by the facts at issue."  Scott, 979 F.3d at 990.  And here, the evidence demonstrated that Johnson, with Bullen, J. Dadrawala, the Dadarwalas, Patel, and others, entered into an agreement to facilitate sex trafficking at the SML.

Samantha Seyforth, an independent prostitute working at the SML for many years, gave testimony about the operations at the SML.  She explained that neither the owners nor other employees at the motel ever asked her to stop what she was doing, even though they knew she was performing acts of prostitution.  (Tr. 401-02.)  Seyforth further testified that "[t]here was probably only one

12

couple [she] could think of [who] stayed there [who] wasn't doing anything wrong" and confirmed that essentially everyone staying at the SML was engaged in some sort of crime.  (See id. 402-03.)  She further testified that, from time to time, the owners "would call [her] room and tell [her] to chill out with visitors 'cause there was law enforcement in the area or in the parking lot."  (Id. 399; see also id. 609-10 (Dawn testifying to same); see also id. 45 (Danielle testifying to same).)  Seyforth also testified that J. Dadarwala had approached her about the work she was doing at the SML and "would sometimes send people to [her] room," meaning "[j]ohns . . . people to see [her] for prostitution."  (Id. 400; see also id. 611 (Dawn testifying to same); see also id. 47 (Danielle testifying to same).) Additionally, Seyforth testified that Patel, one of the housekeepers, would not knock when he was cleaning rooms, would "just come in," and sometimes when she was asleep "he would reach under the blanket and touch [her] inappropriately" and ask her for sexual favors.  (Id. 400-01; see also id. 612 (Dawn testifying to same); see also id. 48 (Danielle testifying to same).)

Danielle, an independent prostitute working at the SML, testified that the Dadarwalas "would let us slide on paying the rooms" and "wait for us to take appointments, sometimes letting us go an entire week without paying."  (Id. 44-45.)  Danielle also testified that the Dadarwalas "would call our rooms and say that

13

they had somebody [who] was interested in a date, if we were available and wanted to take it." (Id. 45-46.)  Danielle and Dawn both testified that there was a box of condoms in the office, and depending on who was in the office and their relationship with the prostitutes, condoms would cost a dollar each or be given to them for free.  (Id. 52-53, 612-13 (describing GX 202.55).)

Dawn testified that when she and her sister Danielle arrived at the SML, Bullen was working there as a pimp.  (Id. 605-06.)  He tried to recruit them, but they declined, and the agreement they came to with Bullen was "[a]s long as we were working independently, it was not a problem."  (Id. 606-07; see also id. 41-43 (Danielle testifying to same).)  That was because Bullen "ran that property," which was why other pimps typically never stayed at the SML; Bullen also "ran the owners . . . they basically did what he wanted them to do."  (Id. 608-09.)  Danielle testified that on numerous occasions, she saw Bullen hand the Dadarwalas "large sums of cash, more than it would just be covering a few rooms."  (Id. 52.)  She also explained Bullen had reserved rooms at the SML that "were not to be touched because they were his" regardless whether there were any girls in them.  (Id.)

Furthermore, Danielle and Dawn both testified that Bullen's "main girl" questioned them about the Defendant being at the SML; Dawn told her Johnson was her boyfriend, and Bullen's associate said it "would cause some issues if it was not just a

14

romantic relationship." (Id. 64; see also id. 622.) Danielle testified she did not see Johnson and Bullen speak, but did "see them acknowledge each other, like, a head nod or just, like, walking past somebody, you acknowledge somebody on the street . . . no animosity or conflict." (Id. 64-65.) Dawn testified that she had a conversation with Johnson that Bullen was not going to be happy with them staying at the SML, so she suggested that maybe she and Johnson should go somewhere else. (Id. 622.) Johnson told Dawn not to worry because he would talk to Bullen to make sure that it was okay for them to be at the SML. (Id. 622-23.) Dawn testified that she and Johnson continued to stay at the SML, and "other girls came," so "obviously [Johnson and Bullen] talked and it worked out that he could be there." (Id. 623.)

Dawn also testified about an incident where she finally got her keys back to her room and told Johnson she was done with him. (Id. 644.) Dawn had told the managers and Patel not to let Johnson into her room because she wanted nothing to do with him anymore and the managers and Patel knew Dawn and Johnson "were always together." (Id. 645.) However, while Dawn was sleeping, Patel let Johnson into her room; Dawn woke up with Johnson on top of her, who proceeded to anally raped her. (Id. 645-47.) Afterward, Dawn went to the office, told the manages and Patel what happened, and cursed Patel out; Patel said he let Johnson in Dawn's room because Johnson was "always with" Dawn, even though

15

she told Patel earlier not to do that.  (Id. 647.)  From that point, the managers did not let Johnson in Dawn's room again but continued to rent Johnson other rooms at the SML.  (Id. 647-48.) Dawn testified that Johnson would sit in his car with his music playing, gun on his lap, wanting Dawn to see him with other girls. (Id. 648.)

As recited above, there was ample proof Johnson, Bullen, J. Dadarwala, the Dadarwalas, Patel, and others, "acted in concert" to facilitate sex trafficking at the SML by "purposefully" arranging for commercial sex dates. See Scott, 979 F.3d at 990-91. Johnson and Bullen worked as pimps who had a "tacit agreement" with each other to coexist at the SML while each sex trafficked women and generated money through commercial sex work.  See id. The Dadarwalas and J. Dadarwala assisted these pimps by: turning a blind eye to the general crime they knew was happening there; warning when law enforcement was nearby; providing condoms for little to no cost; and helping arrange commercial sex dates from time to time.  Patel would let himself in the rooms of the women working at the SML, ask those women for sexual favors, and even let Johnson, a pimp, into Dawn's room while she was sleeping without her permission after she explicitly told Patel not to do so.

It is "irrelevant" that Johnson's and Bullen's "individual goals were limited in scope" to overseeing their own

16

lines of commercial sex "business," which for Johnson, also occurred at other hotels on Long Island. Khalupsky, 5 F.4th at 288-89. As the Second Circuit has articulated, "[c]o-conspirators' goals 'need not be congruent for a single conspiracy to exist, so long as their goals are not at cross-purposes.'" Id. at 289 (quoting Maldonado-Rivera, 922 F.2d at 963).

The Court also rejects Defendant's contention that the Government failed to prove a single conspiracy because there was no testimony of direct communication between Johnson and Bullen. (See Support Memo at 13.) There is no such requirement and "[a] single conspiracy may encompass members who neither know one another's identities, . . . nor specifically know of one another's involvement." United States v. Sureff, 15 F.3d 225, 230 (2d Cir. 1994) (citation modified). Moreover, although circumstantial, the evidence was sufficient for the jury to conclude that Johnson was a part of a larger conspiracy with Bullen and the SML owners and staff members. See United States v. Chartier, No. 17-CR-0372, 2021 WL 3795352, at *38 (E.D.N.Y. Aug. 26, 2021), aff'd, No. 22-3125, 2024 WL 3617023 (2d Cir. Aug. 1, 2024); see also Khalupsky, 5 F.4th at 290 (the evidence sufficiently supported a single conspiracy where the defendant "knew that he depended on a large network of people to facilitate his illicit trading, and he agreed that the profits he generated would be shared with them"); United States v. McFadden, No. 13-CR-0284, 2015 WL 6506945, at

17

*15-16 (E.D.N.Y. Oct. 27, 2015), aff'd, 689 F. App'x 76 (2d Cir. 2017); United States v. Figueroa, No. 08-CR-0749, 2010 WL 11463852, at *10 (E.D.N.Y. Mar. 2, 2010) ("This circumstantial evidence formed the basis of a reasonable inference that there was a relationship among the dealers . . .; a connectedness of their sales; and a common objective. It thus sufficiently evidenced the 'interrelationship and interdependency' of the coconspirators and of their spheres of activity necessary to support a finding of the existence of a conspiracy."), aff'd, 464 F. App'x 35 (2d Cir. 2012).

Taken together, and drawing all inferences in favor of the Government, there was sufficient evidence for a rational jury to find beyond a reasonable doubt that Johnson entered into an unlawful agreement with Bullen, J. Dadarwala, the Dadarwalas, Patel, and others, with the object of committing sex trafficking. Therefore, Defendant's motion for a judgment of acquittal on Count One for conspiracy to commit sex trafficking is DENIED.

2.    Johnson is Not Entitled to a Judgment of Acquittal on Counts Two or Four, Sex Trafficking of Dawn R. and Ashley L. in Violation of 18 U.S.C. §§ 1591(a)(1), (a)(2) and (b)(1)

Johnson argues the Court should direct a verdict of acquittal of Counts Two and Four of the Superseding Indictment, which charged him with sex trafficking in violation of 18 U.S.C. §§ 1591(a)(1), (a)(2) and (b)(1) as to Dawn R. and Ashley L.,

18

respectively. These charges require proof beyond a reasonable doubt that Johnson knew or was reckless to the fact that force, threats of force, fraud, or coercion were used to cause Dawn and Ashley to engage in a commercial sex act (among other things). See 18 U.S.C. § 1591(a)(1). Johnson's main argument is that the evidence was insufficient to prove he used force, fraud, or coercion to cause Dawn and Ashley to engage in commercial sex acts. (See generally Support Memo at 14-18; see also Reply at 6-8.)

As courts in this Circuit have held: "A defendant's behavior is coercive when it fits within the definition of § 1591(e)(2)[5] and is 'sufficiently serious to cause both the victim and reasonable people of the same background and in the same circumstances to feel coerced.'" United States v. Frey, 736 F. Supp. 3d 128, 139 n.5 (E.D.N.Y. 2024) (quoting United States v. Purcell, 967 F.3d 159, 192 (2d Cir. 2020)). Viewing the evidence in the light most favorable to the Government, as discussed infra, there was sufficient evidence for the jury to find Johnson used coercion to cause both Dawn and Ashley to engage in commercial sex acts.

---

[5] Section 1591(e)(2) defines "coercion" as: "(A) threats of serious harm to or physical restraint against any person; (B) any scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm to or physical restraint against any person; or (C) the abuse or threatened abuse of law or the legal process." 18 U.S.C. § 1591(e)(2).

19

a.    Count Two, Sex Trafficking of Dawn

With respect to Dawn, Johnson asserts "the evidence failed to establish that any force, fraud, or coercion used against Dawn was for the purpose of causing her to engage in or continue to engage in commercial sex work." (See Support Memo at 14-16; see also Reply at 6-7.)  Defendant more specifically argues that he did not cause Dawn to engage in commercial sex acts. (See id.)

However, the Court finds there was sufficient evidence that Johnson used force, fraud or coercion to cause Dawn to engage in commercial sex.  In evaluating the sufficiency of the evidence, the Court must view the evidence "in the light most favorable to the government," draw "all inferences in the government's favor," and defer to "the jury's assessments of the witnesses' credibility."  See Kenner I, 2019 WL 6498699, at *3.  Additionally, the Court must "consider the evidence presented in its totality, not in isolation."  United States v. Anderson, 747 F.3d 51, 59 (2d Cir. 2014) (citation modified).  And the Court may only enter a judgment of acquittal when the evidence that a defendant committed the alleged crime is "nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt."  See Jabar, 19 F.4th at 76 (quoting Guadagna, 183 F.3d at 130 (also noting "each fact may gain color from others")).

Dawn began working as an independent prostitute before she met the Defendant. Dawn also worked alongside her sister,

20

Danielle. At that time, they were both using and addicted to heroin. (See Tr. 598-600.) In or around 2014, Dawn and Danielle moved to and worked as prostitutes at the SML. (See id. 600-01.) Dawn was prostituting for money at the SML to "maintain a drug habit." (See id. 602.) When she first started, she did not work for anyone, as she was "independent;" this meant she was taking her own appointments, seeing who she wanted to see, charging what she wanted to charge, and working when she so chose. (See id. 602-03.) As an independent prostitute, Dawn also kept all the money received from her commercial sex dates. (Id. 603.)

Eventually, there came a time when Dawn began working for Johnson. (Id. 603-04.) Dawn and Danielle first met Johnson as their drug dealer. (Id. 616-17.) However, in late 2014 or 2015, Johnson became Dawn's pimp. (Id. 617.) Dawn and Johnson began spending time together, and in the beginning, he treated her "very kind and very loving," called her "my beloved," bought her little items and gave her free drugs; Johnson also would make promises to Dawn about their future, saying things such as it was them against the world or they were going to make their money and then get out of there and get a place. (Id. 618-19.) Dawn also gave Johnson money because he would tell her how "he was fighting with his baby momma and she would do all this stuff and . . . flush his drugs and he needed money." (Id. 619.) At the time, Dawn

21

believed Johnson's promises because they made her feel good; however, Johnson did not fulfill any of them. (Id. 619-20.)

Dawn's relationship with Johnson greatly affected her relationship with her sister; Johnson would tell Dawn, "[your sister is] trying to fuck me, she's trying to suck my dick, she wants me." (Id. 620.) Believing him, Dawn would not want to interact with her sister. (Id.) Since Dawn and Danielle were fighting, Dawn left their shared room and got a room with Johnson, which was next door to Danielle's room. (Id. 620, 623-24.) Further, Dawn could not talk to Danielle when Johnson was around because "Danielle would try to get [Dawn] to go back with her and that wasn't going to happen"; Dawn was working for Johnson at that point, and he would not have let Dawn go back to Danielle because he would have lost money. (Id. 624.)

Dawn testified that one day, Johnson brought two girls to Dawn's room because he wanted her to teach them how to make money; although Dawn did not want to, she did not refuse because she was not comfortable telling Johnson no. (Id. 625-26.) One night, with the other two girls in the room, the Defendant proceeded to "anally force [Dawn] to have sex with him," went to the bathroom to clean himself, and left the room. (Id. 626-27.) Dawn testified she was bleeding from her anus and was in pain from him grabbing at her mouth. (Id. 627.) Even though Dawn felt horrible, when the Defendant would come back to her, he would be

22

nice, and she would "tolerate any little bit of affection or love" that he gave her. (Id. 628.) Dawn further testified that even though she did not like it, Johnson would force her to have sex with him in front of the other girls, because "[y]ou do what he wanted you to do and that was it." (Id. 630.)

Dawn also explained that Johnson would get mad if she was not making enough money or if she was getting "too messed up" on drugs. (Id.) Dawn testified about the Defendant withholding drugs from her when he was busy or with his daughter, which she said was intentional; as a result, Dawn would get "dope sick",[6] but "still had to see customers because [she] had to come up with money . . . it was . . . having to see somebody like that, it was like a nightmare." (Id. 631.) Dawn had to continue seeing customers to earn money to cover her expenses since Defendant constantly harassed her claiming he was paying for everything, and Dawn was not. (Id. 631-32.) Dawn further explained the money she earned from her work paid for the room for herself and the drugs she was using, but she never saw any excess money. (Id. 632.)

Additionally, Dawn testified she always saw the Defendant with a gun, stating he "always had a gun on him" whether "on his lap", "on the side" or "in the trunk." (Id. 634.) This

---

[6] Dawn described being "dope sick" as follows: "It's horrible. You're sweating, you're freezing, diarrhea, shaking, the restless legs. You just want to die. It's--it's horrible." (Tr. 599.)

made Dawn nervous as she was unsure of what Defendant was capable. (Id.)  For example, there was one incident where Danielle and friends of Dawn's were knocking on Dawn's door, wanting to speak with her.  (Id. 634.)  The Defendant ordered Dawn to tell them to leave, which she did. (Id. 635.)  Dawn testified she wanted them to leave because she did not want the Defendant to hurt anyone because "he kept saying tell them to fucking leave . . . [a]nd he's [] behind the door with the [] gun"; Dawn was nervous he was going to shoot her, her sister, or her friends.  (Id.)  Eventually, Dawn started taking more drugs because she "hated [her] life" and realized the Defendant was "full of shit at that point" and he "wasn't serious" about her; he was "manipulating [her] and trying to get [her] to feel like [she] was special to him and [she] wasn't"; she was "just another one" of "his whores."  (Id. 635-36.)

        Dawn testified Johnson held the keys to the room she was staying in, which was a change from when she was working independently and always had a key to the room she was staying in. (Id. 640-41.)  When Dawn was working for Johnson, she "just had to take whoever called," she was not able to "take a day off" because she was "very intimidated by him" because he was very "aggressive" and "forceful." (Id. 642-43.)  Eventually, toward the end of Dawn's time with Johnson, she wanted him to leave her alone, but he would not.  (Id. 643.)  Dawn finally got the key back to her room when she told Johnson she was going to stop working for him, and "he

24

was like fuck you" and he threw the key on the bed. (Id. 644.) Then, Dawn felt safe because she could lock her door and Johnson would not be able to get in; she even told the Dadarwalas and other hotel staff not to let Johnson in her room. (Id. 644-45.) However, Patel let Johnson in her room one night, and Dawn woke up to Johnson on top of her, forcing himself on her again. (Id. 645.) Dawn testified she did not want to have sex with Johnson at that point, but he anally raped her. (Id. 647.) She would occasionally see Johnson after that because he would "sit in his car with the music playing, gun on his lap" which made Dawn "petrified." (Id. 648-49.) Dawn further testified she finally came to realize Johnson was her pimp and not her boyfriend because "a boyfriend wouldn't violate you . . . wouldn't force you to do things you didn't want to do" and she knew he did not love her or care about her and he manipulated her. (Id. 649.) She felt like she was "unlovable" so his "manipulation tactic" was to make her feel like she was "special." (Id.) Dawn did not leave Johnson sooner because of his control and manipulation, and her fear of him and his aggressive and cruel nature. (Id. 604-05, 651.) Johnson also knew everything about Dawn, from her family (her sister, Danielle) to her identification card that had her mother's address on it; additionally, Johnson made it out to be that he was "not the one to be messed with." (Id. 651.) Dawn's fear of Johnson led her to take a picture of Johnson's license when he was asleep and

25

occasionally leave things in his car, so that if anything bad ever happened to her, she wanted something to tie Johnson to her.  (Id. 604-05.)

Evaluating all the evidence in the light most favorable to the prosecution, it establishes that a rational trier of fact could have found beyond a reasonable doubt that Johnson used force, fraud, or coercion to cause Dawn to engage in commercial sex acts. See United States v. McKen, No. 23-CR-0377, 2025 WL 1384125, at *9 (E.D.N.Y. May 13, 2025) ("We will sustain the jury's verdict if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (emphasis in original) (quoting United States v. Pierce, 785 F.3d 832, 838 (2d Cir. 2015))).  There was sufficient evidence at trial, discussed supra, that Johnson caused Dawn to engage in commercial sex acts. Dawn testified of multiple instances where Johnson used physical and sexual violence against her, including forcing her to have sex with him in front of other girls, which she did unwillingly; Dawn explained Johnson did this to her because he was a "very violent, perverted . . . controlling, manipulating man."  (Tr. 630.)  When asked to explain what she meant by "controlling," Dawn responded: "[y]ou do what he wanted you to do and that was it."  (Id.)  For example, he would get mad if Dawn was not making enough money or if she was "getting too messed up" on drugs.  (Id.)  Dawn testified Johnson would intentionally withhold drugs from Dawn if he was

busy and she would get dope sick but would "still ha[ve] to see customers because [she] had to come up with money. . . it was like a nightmare." (Id. 631.) She also testified if she was too high on drugs, she "had no choice" and "had to make money" and "had to work" to pay Johnson. (Id. 637.) Even when Dawn was left alone in a room with drugs, she never took any of those drugs because she did not want to "piss him off", "be responsible for them", and "have to work more to make up more." (Id. 651.) Dawn also testified if she got "too messed up on the dope," Johnson would give her cocaine so she could "get up and do what [she] needed to do to make money." (Id. 633.) She further testified Johnson was getting most of the money she made from her commercial sex dates, but she was not getting the equivalent in drugs from him. (Id. 632.) Dawn also saw Johnson constantly with a gun on his person, which made her nervous because she did not know his capabilities. (Id. 634-35.) In addition, Dawn did not have a key to the rooms she stayed in; Johnson was the one who held the keys to her room. (Id. 640-41.) This evidence is sufficient for a rational jury to find Dawn was forced or coerced into performing commercial sex acts for Johnson. See, e.g. McKen, 2025 WL 1384125, at *9-10 (finding there was more than sufficient evidence for a rational jury to find defendant coerced the victim into performing commercial sex acts even though the victim was a prostitute prior to meeting defendant "and continued to engage in sex work 'for

27

financial and other motives,'" because that was an issue of credibility for the jury to have evaluated, and the evidence at trial showed defendant "frequently used physical violence to prevent her from going 'out of pocket,'" threatened the victim with guns on multiple occasions, and controlled the victim's finances "and exploited the situation to maintain control over her").

Additionally, Defendant treated Dawn "very kind and very loving" in the beginning when they first met, called her his "beloved," and made promises that they were going to "build [their] empire," "get a place," and "be together"; Dawn initially believed these things, although they never came to fruition. (Id. 618-20.) This evidence, in conjunction with all the evidence discussed supra, is sufficient for a rational jury to find the Defendant additionally used fraud against Dawn to cause her to engage in commercial sex acts. (See Court's Jury Charge at Tr. 889 ("Fraud means that the defendant knowingly made a misstatement or omission of a material fact to entice the victim. A material fact is one that a reasonable person would expect to rely on when making a decision.").)

While Johnson tries to claim this case is akin to United States v. Chen (see Support Memo at 15), where the court reasoned, "[t]he force needs to have influenced the nature of the acts to be performed, or caused the individual to engage in commercial sex

28

work," the force, fraud, and coercion present here was not "merely incidental to the commercial sex trade."  No. 22-CR-0158, 2025 WL 2271484, at *5 (E.D.N.Y. July 7, 2025) (citing Lawson v. Rubin, No. 17-CV-6404, 2018 WL 2012869, at *14 (E.D.N.Y. Apr. 29, 2018)).  The record is replete with evidence that Dawn was forced into performing commercial sex acts she did not want to because of the Defendant.  In fact, the Chen court also acknowledges: "Even if force was not used to force the victims to enter into prostitution in the first place, it can sustain a conviction if it caused them to engage in particular commercial sex acts."  Id. at *4.  The evidence proves that is what happened here to Dawn. See also United States v. Shine, No. 20-0314, 2022 WL 761520, at *2 (2d Cir. Mar. 14, 2022) (finding evidence was sufficient where defendant "exploited victims' fear of homelessness, withdrawal, and violence to compel them to engage in commercial sex acts when they otherwise would not have done so").  Thus, having considered the totality of the evidence, Defendant's Rule 29 motion for a judgment of acquittal on Count Two is hereby DENIED.

b.   Count Four, Sex Trafficking of Ashley

With respect to Ashley, Johnson asserts "[t]he evidence at trial failed to establish beyond a reasonable doubt that [Defendant] used force, fraud, or coercion to cause Ashley to engage in commercial sex acts."  (Support Memo at 17-18; see also Reply at 7-8.)  Defendant argues that because Ashley did not

29

testify at trial, and the "only testimony regarding Ashley's time at the Sayville Motor Lodge came from the cooperating witness Samantha Seyforth," "there is no evidence supporting the arrangement Ashley had at the SML was anything other than voluntary."  (Support Memo at 17.)

However, the Court finds there was sufficient evidence that Johnson coerced Ashley into engaging in commercial sex.  In evaluating the sufficiency of the evidence, the Court must view the evidence "in the light most favorable to the government," draw "all inferences in the government's favor," and defer to "the jury's assessments of the witnesses' credibility."  Kenner I, 2019 WL 6498699, at *3.  Additionally, the Court "must consider the evidence presented in its totality, not in isolation."  Anderson, 747 F.3d at 59 (citation modified). And the Court may only enter a judgment of acquittal when the evidence that a defendant committed the alleged crime is "nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt."  See Jabar, 19 F.4th at 76 (quoting Guadagna, 183 F.3d at 130 (also noting "each fact may gain color from others")).

Seyforth testified that Johnson reached out to her to discuss bringing Ashley from Delaware to the SML in New York to engage in prostitution. (See Tr. 407, 409.)  At Defendant's request, Seyforth created commercial sex advertisements, communicated with potential customers, and facilitated commercial

sex acts for Ashley. (See id. 406-07, 419-37, 459-60, 494; see also GX 301.3 (commercial sex advertisements created at Defendant's direction to advertise Ashley), 501 (text messages and voice notes between Defendant and Seyforth regarding Ashley).) Seyforth arranged Ashley's "first act of prostitution" with one of Seyforth's "regulars" because that person "was somebody [Seyforth] knew was safe that [Ashley] could experience that with". (See id. 412.) Ashley was expected to "make money" for Johnson, and in exchange, she would get drugs, because "[a]t the time, she was a drug addict." (Id. 409-10.) Seyforth testified that the "business arrangement" was if Ashley "did what she was supposed to do [i.e., engage in prostitution], then she would be able to get drugs" from Johnson. (Id. 410.) Seyforth explained that Ashley "appeared to be on drugs" and had a "bad habit." (Id. 411.) Seyforth further testified that Ashley "used [drugs] in front of [her]," including an incident where "[Ashley] was using the bathroom one day and [Seyforth] had told [Ashley] that [Seyforth] had a date coming and [Ashley] had a needle in her arm with blood dripping out of it." (Id.) Seyforth also testified Ashley did not have control over the drugs she used. (See id. 415-16.) Seyforth further explained Ashley never got drugs for free and "had to see people . . . had to have dates, make money," as dictated by Johnson. (Id. 462-63.) When Seyforth was asked how Ashley's experience with the Defendant was different than Seyforth's, Seyforth explained, "I feel like

31

our relationship and our bond was different, and I'm not confined by the restraints of addiction.  So it wouldn't have any bearing on me. That's why it was different.  [Ashley's] a drug addict. I'm not." (Id. 465.)  When asked why Ashley being a drug addict made her experience with Johnson different than Seyforth's, Seyforth responded, "[b]ecause she needed what he had" and "[s]he had to [work] whether she wanted to do it or not to get those drugs, otherwise she would be sick."  (Id.)

When Ashley saw customers and made money, the money went into Seyforth's top drawer and then was given to Johnson.  (See id. at 417.)  Ashley only occasionally kept a small amount of money for herself, without the Defendant's knowledge, when Seyforth would tell her to keep some money on the side for "a rainy day" fund because "anything can happen" and she may "need a way to get away if [she] want[ed] to."  (Id. 415.)  Seyforth also testified that, one evening, Defendant texted Seyforth at 8:17 PM telling her to "[g]ive old girl a break 'til 9:00," which Seyforth explained meant to "let [Ashley] relax" and "don't let her see anybody until nine o'clock."  (Id. 440-41; see also GX 501.7.) Seyforth also shared that during Ashley's second trip to the SML, Ashley stayed in a different room than Seyforth, which meant Seyforth did not take care of Ashley's ads or her communications with potential customers, so  "Ashley couldn't make money" and "ended up sleeping on the side of 7-11, waiting for her family to

32

drive from Delaware to come get her" because the Defendant did not return to pick Ashley up.  (Tr. 463-64.)

Evaluating all the evidence together, it establishes that a rational trier of fact could have found beyond a reasonable doubt that Johnson used coercion to cause Ashley to engage in commercial sex acts.  See McKen, 2025 WL 1384125, at *9 ("We will sustain the jury's verdict if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (quoting Pierce, 785 F.3d at 838 (citation modified))).  There was sufficient evidence at trial, as discussed supra, that Johnson exploited Ashley's drug addiction and fear of withdrawal to coerce her into prostitution.  Ashley: came to the SML with Johnson as a drug addict; received drugs from Johnson while at the SML only if she engaged in prostitution; was expected to give Johnson all the proceeds she made from her sex work; was directed when to take breaks from her dates with customers by Johnson; and, the moment she was left at the SML without Johnson, called family members from Delaware to pick her up and bring her home.  See, e.g., McKen, 2025 WL 1384125, at *9 ("[The defendant's] suggestion that his withholding drugs was not coercive, and that [the victim] was free to leave all along blinks at the totality of the evidence presented at trial. [The defendant] not only withheld drugs from [the victim], leading to "very painful . . . agonizing" withdrawals, he also controlled all the money [she] made, and even

33

determined when and what she ate." (citation modified)); see also

Shine, 2022 WL 761520, at *2 (finding evidence sufficient because

defendant "exploited victims' fear of homelessness, withdrawal,

and violence to compel them to engage in commercial sex acts when

they otherwise would not have done so"). Thus, having considered

the totality of the evidence, Defendant's Rule 29 motion for a

judgment of acquittal on Count Four is hereby DENIED.

      3.    Johnson is Not Entitled to a Judgment of Acquittal on Count Five, Interstate Prostitution of Ashley L. in Violation of 18 U.S.C. § 2422(a)

Johnson argues the Court should direct a verdict of

acquittal of Count Five of the Superseding Indictment, charging

him with interstate prostitution of Ashley L. in violation of 18

U.S.C. § 2422(a) (hereinafter, "Section 2422(a)"). (See Support

Memo at 18-21; see also Reply at 9-11.) Johnson's argument is

two-fold; for the reasons stated infra, both arguments are

rejected.

      a.    Section 2422(a) Does Not Require a Victim to Travel Without Any Assistance From the Defendant

The first part of Johnson's argument is that Count Five

of the Superseding Indictment charged Johnson with "knowingly and

intentionally persuading, inducing, enticing and coercing Ashley

to travel in interstate commerce to engage in prostitution" in

violation of Section 2422(a) of the Mann Act, but based upon the

evidence presented at trial, which proved that Johnson knowingly

34

transported Ashley across state lines, Ashley did not "travel[]" under her own steam from Delaware to New York" per Section 2422(a); thus, Johnson could not have violated Section 2422(a).    (See Support Memo at 18.)    Johnson further contends the Government should have, but did not, charge Johnson with violating 18 U.S.C. § 2421(a) (hereinafter, "Section 2421(a)") instead of Section 2422(a), since Section 2421(a) of the Mann Act prohibits conduct for "knowingly transport[ing] any individual in interstate or foreign commerce . . . with intent that such individual engage in prostitution . . . ."    (Id. (quoting Section 2421(a)).)

Defendant relies heavily upon United States v. Purcell, 967 F.3d 159 (2d Cir. 2020), United States v. Holland, 381 F.3d 80 (2d Cir. 2004), and United States v. Jones, 909 F.2d 533 (D.C. Cir. 1990) to support this argument. (See id. at 18-20.)    However, the Court finds these cases inapposite.    Judge Matsumoto recently analyzed and rejected a nearly identical argument in United States v. Forney, No. 24-CR-0146, 2025 WL 3677273 (E.D.N.Y. Dec. 18, 2025), which decision and rationale this Court adopts and incorporates herein:

> Mr. Forney asserts that Section 2421(a) applies to circumstances where the defendant personally or through an agent performed the act of transporting, but Section 2422(a), requires that the victim travel "under her own steam" without any transportation assistance from the defendant. (Id.) In support of his assertion, Mr. Forney cites and quotes Purcell. (Def. Mot. at 5 (quoting Purcell, 967

35

F.3d at 190) ("A defendant will be deemed to have 'transport[ed] an individual under Section 2421 where the evidence shows that the defendant personally or through an agent performed the proscribed act of transporting, as opposed to situations where the victim travels under her own steam, without need of anyone to 'transport' her.")). Mr. Forney argues that because the evidence established that Mr. Forney transported Jonnica C. to New York and Connecticut in violation of Section 2421(a) as charged in Count Two, the evidence does not establish that Jonnica C. traveled "under her own steam" to support a guilty verdict under § 2422(a) as charged in Count Three. (Id.)

Mr. Forney is incorrect. Mr. Forney's conviction under § 2421(a) does not preclude his conviction under § 2422(a) because Section 2421(a) and Section 2422(a) are separate and distinct offenses and penalize different conduct. Section 2421(a) states in relevant part:

> Whoever knowingly transports any individual in interstate or foreign commerce, ... with intent that such individual engage in prostitution, or in any sexual activity for which any person can be charged with a criminal offense, or attempts to do so, shall be fined ... or imprisoned ... or both. [Section 2241(a)] (emphasis added).

As this Court has previously explained, transportation of a person interstate and inducing a person to travel interstate are two separate actions and crimes that can be attributed to the same person. See United States v. Forney, No. 24-cr-146 (KAM), 2025 WL 2208298, at *5 (E.D.N.Y. Aug. 4, 2025) [hereinafter, "Forney II"]. "One person may be guilty of both offenses although they may arise out of the same transaction" because "it would not require the same evidence to

36

establish that one knowingly transported a woman, or caused her to be transported, and to prove that he induced the same woman to go in such commerce." United States v. Saledonis, 93 F.2d 302, 303-04 (2d Cir. 1937) (analyzing and interpreting the two predecessor statutes to § 2421(a) and § 2422(a)); see also United States v. Taitano, 442 F.2d 467, 469 (9th Cir.), cert. denied, 404 U.S. 852, 92 S.Ct. 92, 30 L.Ed.2d 92 (1971) (finding § 2421 and § 2422 are "separate and distinct"); Batsell v. United States, 403 F.2d 395, 400 (8th Cir. 1968), cert. denied, 393 U.S. 1094, 89 S.Ct. 865, 21 L.Ed.2d 785 (1969) (same); Nunnally v. United States, 291 F.2d 205, 206 (5th Cir. 1961) ("The offense of causing transportation of a woman under § 2421 and the offense of inducing a woman to go in interstate commerce for immoral purposes under § 2422 constitute separate crimes.")

Accordingly, a conviction under Section 2422(a) does not require the government to have presented evidence that Jonnica C. traveled "under her own steam" to New York or Connecticut. Section 2422(a) does not state "whoever knowingly persuades ... any individual to travel" alone or by their own steam "shall be fined ... or imprisoned." To read such a requirement into the statute violates the well-established principle that courts do not read in a requirement that Congress omitted. See e.g., Olivieri v. Stifel, Nicolaus & Co., Inc., 112 F.4th 74, 89 (2d Cir. 2024) (quoting Jama v. Immigr. & Customs Enf't, 543 U.S. 335, 341, 125 S.Ct. 694, 160 L.Ed.2d 708 (2005) ("[W]e 'do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply.' ")). Because "persuasion is distinct from the actual transportation," "convincing someone to transport himself or herself across state lines for the purpose of prostitution completes the crime under § 2422(a)," no matter if a defendant travels with the person or not. United States v. Williams, 291 F.3d

37

1180, 1187 (9th Cir. 2002), <u>overruled on other grounds by United States v. Gonzales</u>, 506 F.3d 940 (9th Cir. 2007).

<u>Courts also agree that § 2422(a) does not require a victim to travel alone or on her "own steam" without any assistance from a defendant. Courts have upheld § 2422(a) jury convictions even when the underlying 2422(a) conduct included actual transportation by the defendant.</u> <u>See United States v. Kelly</u>, 609 F. Supp. 3d 85, 136 (E.D.N.Y. 2022), <u>aff'd</u>, 128 F.4th 387 (2d Cir. 2025) (upholding a 2422(a) jury conviction when Defendant paid for the victim's plane ticket); <u>United States v. Townsend</u>, 521 F. App'x 904, 907 (11th Cir. 2013) (upholding a § 2422(a) conviction where defendant traveled with the victim to another state in denying Rule 29 motion based on insufficiency of evidence).

Mr. Forney relies heavily on <u>United States v. Purcell</u>, 967 F.3d 159 (2d Cir. 2020) and <u>United States v. Holland</u>, 381 F.3d 80 (2d Cir. 2004). (Def. Mot. at 5-7.) But both cases fail to support his argument that a violation of § 2422(a) requires evidence that Jonnica C. traveled anywhere under her own steam. The Second Circuit in <u>Purcell</u> reversed the conviction on the § 2422(a) Count due to insufficient evidence of venue. <u>Purcell</u>, 967 F.3d at 185-91. The Second Circuit in <u>Purcell</u> only drew a distinction between a "proscribed act of transporting" and "where the victim travels under her own steam" in explaining when a "defendant will be deemed to have 'transport[ed]' an individual under Section 2421." <u>Id.</u> at 190 (quoting <u>United States v. Holland</u>, 381 F.3d 80, 86 (2d Cir. 2004)). Likewise, the Second Circuit in <u>Holland</u>, drew the same distinction in its § 2421(a) analysis but also did not comment on the required elements of § 2422(a). <u>See Holland</u>, 381 F.3d at 86. <u>Neither case held that § 2422(a) requires, and is only limited to, when a victim travels without any transportation assistance from a defendant.</u>

38

United States v. Jones also provides no basis to grant a judgment of acquittal on Count Three. See 909 F.2d 533 (D.C. Cir. 1990); (Def. Mot. at 5[])[.]   In Jones, the D.C. Circuit held that an escort service's advertisements and support services could not fulfill the "transport" element under § 2121(a) when the escorts made their own travel arrangements and transported themselves interstate. 909 F.2d at 540. Although the D.C. Circuit, in dictum, then drew a distinction between "§ 2421 cases where a defendant performs the proscribed act of transporting" and § 2422 "cases in which the defendant provides the motivation, ranging from persuasion to coercion, but the person then 'travels' under her own steam," the D.C. Circuit did not state that § 2422 violations are only limited to cases where a defendant provides the motivation but the person then travels under her own steam. See id. Moreover, contrary to Mr. Forney's assertion (Def. Mot. at 5-6), the Second Circuit in Purcell did not "adopt[ ]" any Jones interpretation of § 2422(a). See 967 F.3d at 191-192. The Second Circuit in Purcell and Holland only cited to the relevant Jones' language in its § 2421(a) analysis. See 967 F.3d at 191-192; 381 F.3d at 86. Neither adopted any Jones interpretation of § 2422(a). See id.

Mr. Forney's reliance on Jones is misplaced. Although drawing a distinction between cases where a victim is actually transported by a defendant versus cases where a victim travels under her own steam may "together comprise a set that captures all instances in which a person crosses a state line," Jones, 909 F.2d at 540, it does not capture all instances of defendant misconduct related to a victim's crossing of state lines under § 2421(a) and § 2422(a).  The plain language of § 2421(a) and § 2422(a) does not preclude the possibility that a defendant violates both § 2421(a) and § 2422(a).  If a defendant knowingly drives or purchases a transportation

ticket for a victim to fulfill the "transport" element of 2421(a) but does not "persuade, induce, entice and coerce an individual," that is a violation of § 2421(a) but not 2422(a). If a defendant does "persuade, induce, entice and coerce an individual" but fails to directly drive or purchase a ticket that transports an individual, such conduct does not violate 2421(a) but does violate 2422(a). But if a defendant both drives or purchases a transportation ticket for a victim and also "persuade[s], induce[s], entice[s] and coerce[s] an individual," such conduct is a violation of both § 2421(a) and § 2422(a) because "[t]he offense of causing transportation of a woman under § 2421" and the offense of inducing a woman to [travel] in interstate commerce ... under § 2422" are two separate acts both of which "constitute separate crimes." Nunnally v. United States, 291 F.2d 205, 206 (5th Cir. 1961). A violation of § 2422(a) thus does not require that a victim travel "under her own steam" to find a defendant guilty of providing the motivation for someone to engage in interstate prostitution.

United States v. Forney, No. 24-CR-0146, 2025 WL 3677273, at *3-5 (E.D.N.Y. Dec. 18, 2025) (emphases added).

Therefore, Defendant's legal-based challenge to Count Five of the Superseding Indictment on account of allegations that the Government charged him with an inapplicable statute fails.

b.    Sufficiency of the Evidence

The second part of Johnson's argument is that the evidence was insufficient to prove beyond a reasonable doubt that Johnson persuaded, induced, enticed, or coerced Ashley to travel in interstate commerce for the purpose of engaging in prostitution

40

in or about 2021 in violation of Section 2422(a).  (See Support Memo at 18.)  Defendant contends "the [G]overnment failed to present evidence establishing that [] Johnson persuaded, induced, enticed, or coerced Ashley to travel interstate for the purpose of prostitution."  (Id. at 21.)  For the following reasons, viewing the evidence in the light most favorable to the Government, see Kenner I, 2019 WL 6498699, at *3, there was sufficient evidence for the jury to find that Johnson persuaded, induced, enticed, or coerced Ashley to travel in interstate commerce for the purpose of engaging in prostitution.  The Court therefore upholds Johnson's conviction on Count Five.

For Mann Act Interstate Prostitution, the Government needed to prove beyond a reasonable doubt the following elements: (1) the defendant knowingly persuaded, induced, enticed, or coerced Ashley to travel in interstate commerce; (2) Ashley traveled in interstate commerce; and (3) the defendant acted with the intent that Ashley would engage in prostitution.  See Forney, 2025 WL 3677273, at *3; (see also Court's Jury Charge at Tr. 896-99).

First, the evidence showed Defendant knowingly persuaded, induced, enticed, or coerced Ashley to travel in interstate commerce.  As the Court instructed the jury: "persuade" means "to offer an argument or arguments to cause an individual to undertake action, in this case, to travel across state lines, to

41

engage in prostitution"; "induce" means "to lead a person by some influence or motive that acts upon the will to act in a certain way . . . to undertake a certain course of action"; "entice" means "to attract an individual with the offer of some advantage into following a certain course of conduct"; and, "coerce" means "any threat of serious harm to or physical restraint against a person or any scheme, plan, or pattern inten[ded] to cause a person to believe that failure to perform an act would result in serious harm against any person or any abuse or threatened abuse of law or the legal process." (Court's Jury Charge at Tr. 897-98.)  Ashley did not testify at trial; however, the Government's cooperating witness, Samantha Seyforth, testified at length about her first-hand knowledge of Johnson's sex-trafficking of Ashley.[7]

Seyforth testified that Johnson reached out to Seyforth about bringing Ashley from Delaware to the SML in New York to engage in prostitution and Seyforth agreed "to allow [Ashley] in my room and help her out." (Tr. 407, 409.)  At Defendant's request, Seyforth assisted Ashley by creating commercial sex advertisements, communicating with potential customers, and

---

[7]  While Defendant argues "the [G]overnment did not call Ashley as a witness, so there was no direct testimony from Ashley" and instead "attempted to prove the inducement charge through Samantha Seyforth's testimony" (see Support Memo at 20), the Court must "defer[] to the jury's assessments of the witnesses' credibility." See McKen, 2025 WL 1384125, at *10 (quoting Shine, 2022 WL 761520, at *1).

42

facilitating commercial sex acts. (Id. 406-07, 419-37, 459-60, 494; see also GX 301.3 (commercial sex advertisements created at Defendant's direction to advertise Ashley), 501 (text messages and voice notes between Defendant and Seyforth regarding Ashley).) The expectation was that Ashley would "make money" for Johnson and in return she would get drugs because "[a]t the time, she was a drug addict." (Tr. 409-10.) And the "business arrangement" was if Ashley "did what she was supposed to do, then she would be able to get drugs" from Johnson through engaging in prostitution. (Id. 410.) Seyforth further testified that Ashley "appeared to be on drugs" and Ashley used drugs in front of Seyforth, including using drugs intravenously. (Id. 411.) Seyforth arranged Ashley's "first act of prostitution" with one of Seyforth's "regulars" because that person "was somebody [Seyforth] knew was safe that [Ashley] could experience that with". (Id. 412.) Seyforth also testified that Ashley did not have control over the drugs she used. (See id. 415-16.) To get drugs while at the SML, Ashley never got drugs for free and "had to see people . . . had to have dates, make money," as dictated by Johnson. (Id. 462-63.) As previously stated, when Seyforth was questioned regarding how Ashley's experience with the Defendant was different than Seyforth's experience, Seyforth explained, "I feel like our relationship and our bond was different, and I'm not confined by the restraints of addiction. So it wouldn't have any bearing on me. That's why it

43

was different. [Ashley's] a drug addict. I'm not." (Id. 465.)  When asked why Ashley being a drug addict made Ashley's experience different than Seyforth's, Seyforth responded, "[b]ecause she needed what he had" and "[s]he had to [work] whether she wanted to do it or not to get those drugs, otherwise she would be sick." (See id.)

"We will sustain the jury's verdict if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  McKen, 2025 WL 1384125, at *9 (quoting Pierce, 785 F.3d at 838).  Based upon Seyforth's testimony and additional documentation evidence, the Court finds there was sufficient evidence at trial for a rational trier of fact to find that Johnson threatened and exploited Ashley's drug addiction to persuade, induce, entice, or coerce her into prostitution.  See id. (citing Shine, 2022 WL 761520, at *2).  Ashley's drug addiction not only explains why she engaged in prostitution at the SML, but also is enough, factually, for a rational trier of fact to logically infer Ashley's drug addiction provided the leverage for Defendant to persuade, induce, entice, or coerce her into prostitution in the first place.  As the jury was properly instructed: "From the facts that you find to be proved, you are permitted to draw reasonable inferences as would be justified in light of your experience." (Court's Jury Charge at Tr. 850.)

44

Second, Defendant does not dispute the sufficiency of the evidence for the second element, i.e., that Ashley traveled in interstate commerce. (See Support Memo at 20 ("Though the evidence was certainly sufficient to establish that [] Johnson knowingly transported Ashley across state lines . . .").)

Third, Defendant does not entirely dispute that the evidence was sufficient to show he acted with the intent of Ashley engaging in prostitution. (See id. ("Though the evidence was certainly sufficient to establish that [] Johnson knowingly transported Ashley across state lines, and maybe even that the transportation was done with the intent that Ashley engage in prostitution . . . .") (emphasis added).) Seyforth testified Johnson reached out to her about coming to the SML with Ashley, and told Seyforth since she "pretty much [] knew what [she] was doing," he wanted Seyforth "to try and help [Ashley] along the way." (Tr. 407.) Seyforth previously testified at length about her work as a prostitute at the SML. (See id. 391-406.) When asked what happened when Johnson and Ashley arrived at the SML, Seyforth explained, "there was conversations that extended from, you know, their ride up here about what would be going on," and later clarified those conversations were about Ashley "[e]ngaging in prostitution, ads, money, expectations" to make money for Johnson. (Id. 409-10.) Seyforth also testified about text conversations between herself and Defendant on the evening of

45

November 24, 2021.  In one exchange, Defendant texts Seyforth at 8:17 PM telling her to "[g]ive old girl a break 'til 9:00," which Seyforth testified meant to let Ashley relax and not have her see her next client until 9:00 PM.  (Id. 440-41; see also GX 501.7.) Later that same evening at 11:41 PM, Seyforth responded to a text from Johnson, stating: "She just saw someone.  I'm answering her texts more than mine.  I just want her to be able to have something for you while she's here."  (Tr. 441; see also GX 501.7.)  When questioned about the meaning of her text response to Johnson, Seyforth explained she was neglecting her own phone "to make sure that [Ashley] has money for [Johnson]" because Seyforth "just wanted [Johnson] to be able to have money from that situation" so that "he didn't come here for nothing."  (See Tr. 441.)

        The jury was allowed to consider all the above-listed evidence in finding that Johnson was guilty of Mann Act Interstate Prostitution of Ashley L.  See United States v. Elias, 619 F. Supp. 3d 296, 304 (E.D.N.Y. 2022) ("The jury was entitled to credit each piece of evidence in reaching its verdict and finding [defendant] guilty.  This court will not now second-guess the jury's assessments." (citing United States v. Rea, 958 F.2d 1206, 1222 (2d Cir. 1992))).  Thus, Defendant's challenges to the sufficiency of the evidence fail, as the Court finds there was sufficient evidence to support the jury's conviction of Defendant as to Count Five, which charges him with Mann Act Interstate Prostitution of

46

Ashley L. in violation of Section 2422(a) in or about 2021. Accordingly, Defendant's Rule 29 motion for a judgment of acquittal on Count Five is hereby DENIED.

B. Rule 33 Motion for a New Trial[8]

In the alternative, Johnson seeks a new trial pursuant to Rule 33 because: (1) the expansion of the scope of the conspiracy at trial constituted a prejudicial variance and constructive amendment; and (2) Johnson was denied a fair trial by the Government's improper and inflammatory rebuttal summation. (See Support Memo at 21-37; see also Reply at 11-18.) Defendant's arguments are unavailing.

1.    There Was No Constructive Amendment or Prejudicial Variance

Johnson argues a new trial is warranted because the Government expanded the scope of the conspiracy during trial, constituting a constructive amendment and/or prejudicial variance from the Superseding Indictment in violation of the Fifth Amendment. (See Support Memo at 22-29; see also Reply at 11-14.) Specifically, Johnson contends the testimony of victim witnesses,

---

[8]  Johnson may argue that the same arguments supporting his Rule 29 motion also support his Rule 33 motion. To the extent argued, "the same reasons which counsel against the court entering an order of acquittal militate against granting a new trial" and, finding no manifest injustice, the Court denies Johnson's motion for a new trial for the same reasons articulated in connection with his Rule 29 Motion. See United States v. Lillemoe, 242 F. Supp. 3d 109, 124 (D. Conn. 2017), aff'd sub nom. United States v. Calderon, 944 F.3d 72 (2d Cir. 2019).

47

Arianna and Cynthia, who were trafficked by the Defendant at hotels other than the SML, constituted a constructive amendment and/or a variance from the sex trafficking conspiracy charge found in Count One of the Superseding Indictment.  (See id.)  Johnson is not entitled to relief on this basis.

### a.   No Constructive Amendment

"A constructive amendment occurs when the charge upon which the defendant is tried differs significantly from the charge upon which the grand jury voted."  United States v. Ortega, No. 23-7417, 2025 WL 783735, at *3 (2d Cir. Mar. 12, 2025).  To prevail on a constructive amendment claim, a defendant must demonstrate "the government's presentation of evidence and the district court's jury instructions combine[d] to modify essential elements of the offense charged to the point that there is a substantial likelihood that the defendant may have been convicted of an offense other than the one charged by the grand jury."  Kenner I, 2019 WL 6498699, at *9 (citation modified) (quoting United States v. Vebeliunas, 76 F.3d 1283, 1290 (2d Cir. 1996)); see also United States v. Simpson, 227 F. App'x 41, 43 (2d Cir. 2007).  "The charge has been so altered either where (1) an additional element, sufficient for conviction, is added, or (2) an element essential to the crime charged is altered."  Khalupsky, 5 F.4th at 293 (citation modified).  "There is no constructive amendment where a generally framed indictment encompasses the specific legal theory

48

or evidence used at trial. Accordingly, we have consistently permitted significant flexibility in proof, provided that the defendant was given notice of the core of criminality to be proven at trial." Simpson, 227 F. App'x at 44 (citation modified) (first quoting United States v. Salmonese, 352 F.3d 608, 620 (2d Cir. 2003), then quoting United States v. Berger, 224 F.3d 107, 117 (2d Cir. 2000)). "The core of criminality of an offense involves the essence of a crime, in general terms; the particulars of how a defendant effected the crime falls outside that purview." Khalupsky, 5 F.4th at 293 (quoting United States v. D'Amelio, 683 F.3d 412, 418 (2d Cir. 2012)).

After a careful review of the record, and having presided over Johnson's trial, the Court finds that no constructive amendment occurred here. There is no "substantial likelihood that the defendant may have been convicted of an offense other than the one charged by the grand jury" due to "the government's presentation of evidence and the district court's jury instructions" such that they "modifi[ed] essential elements of the offense charged." See Kenner I, 2019 WL 6498699, at *9. Count One of the Superseding Indictment, the only count at issue here, reads:

> In or about and between 2014 and November
> 2022, both dates being approximate and
> inclusive, within the Eastern District of New
> York and elsewhere, the defendant MICHAEL
> JOHNSON, also known as "Wise" and "B.I.,"

49

together with others, did knowingly and intentionally conspire to recruit, entice, harbor, transport, provide, obtain and maintain by any means one or more persons, in and affecting interstate and foreign commerce, and to benefit, financially and by receiving anything of value, from participation in a venture that engaged in such acts, knowing, and in reckless disregard of the fact, that means of force, threats of force, fraud, coercion and a combination of such means would be used to cause such persons to engage in one or more commercial sex acts, contrary to Title 18, United States Code, Sections 1591(a)(1) and 1591(a)(2).

(Revised Trial Indictment ¶ 1.)[9]  This same language from Count One of the Revised Trial Indictment was used verbatim in the Court's jury charge.  (Compare Revised Trial Indictment ¶ 1, with Court's Jury Charge at Tr. 882-83.)

The testimony of Arianna and Cynthia as presented by the Government is evidence that falls within the above-charged conduct of a sex trafficking conspiracy.

### i.   Cynthia's Testimony

Cynthia testified she met the Defendant as her drug dealer. (Tr. 536.)  Cynthia was kicked out of the place she was staying, had nowhere to go, and was "homeless."  (Id. 537-38.) She was addicted to drugs and called the Defendant, her drug dealer, who said he could help.  (Id. 538.)  Cynthia thought Defendant's offer of help meant helping Defendant sell drugs, as

---

[9]  The Court quotes this language from the Revised Trial Indictment, for the reasons previously explained.  (See supra note 2.)

at that time, she was not aware of Defendant's other income streams. (Id. 539.)  Defendant had Cynthia meet him at a Hampton Inn in Farmingville, where he gave her a room key, took her ID from her, gave her drugs, and told her that she owed him and he would be in touch with further instructions.  (Id. 539-40.) Defendant sent Cynthia a text instructing her to send him a "sexy picture" and then told her "that someone would be coming to the room and that he posted me." (Id. 540-41.) Even though Cynthia never indicated to Defendant she would be willing to work as a prostitute that night, she understood Defendant's text message to mean that someone would be coming to her room for sex; someone eventually did arrive at Cynthia's motel room and, although she had never worked as a prostitute before, she had sex with that person "[b]ecause [the Defendant] said I owed him, and he had my ID with my family's address." (Id. 541-42.)  Cynthia knew Defendant had a gun, and because Defendant had her ID with her family's address on it, Cynthia "didn't want anything to happen with my little brother or sister." (Id. 543.)  Cynthia continued to detail her experiences working as a prostitute for the Defendant.  For example, when Cynthia did not answer her phone one day, Defendant told her she "owed him" and she could "either get the money right then and there or [] sleep with him"; because Cynthia did not have the money, she slept with him to make up for the lost wages from her lack of prostitution that day. (Id.

51

543-49.) Cynthia's arrangement with Defendant lasted two months. (See id. 549.) Defendant also required Cynthia to work in another hotel, telling Cynthia she was moving. (See id.) One of the hotels where Defendant had Cynthia work was the SML. (See id. at 549-50.) Cynthia testified she: was aware of other women engaging in prostitution there; was "[a] little bit" familiar with the owners and staff there; and, thought J. Dadarwala knew about the prostitution occurring at the SML, although she did not think the Dadarwalas knew. (Id.)

Cynthia's testimony does not constitute a constructive amendment because the "generally framed indictment" as stated above encompasses this "evidence [that was] used at trial." Simpson, 227 F. App'x at 44. A rational juror could infer from Cynthia's testimony about her interactions with Defendant and her observations at the SML that Defendant knowingly sex trafficked Cynthia by "means of force, threats of force, fraud, coercion, or any combination of such means to cause [Cynthia] to engage in commercial sex acts" (Court's Jury Charge at Tr. 888) as part of a sex trafficking conspiracy at the SML. See United States v. Israel Garcia, No. 24-1673, 2026 WL 817711, at *3 (2d Cir. Mar. 25, 2026) (regarding a Rule 33 motion, stating "[i]n assessing sufficiency, we must view the evidence in the light most favorable to the [G]overnment, crediting every inference that could have been drawn in the [G]overnment's favor, and deferring to the jury's

52

assessment of witness credibility and its assessment of the weight of the evidence" (citation modified)).  Moreover, in the context of a conspiracy charge, "the Government need not set out with precision each and every act committed in furtherance of the conspiracy, particularly where the acts proven at trial were part of the core of the overall scheme and in furtherance of that scheme."  United States v. LaSpina, 299 F.3d 165, 182 (2d Cir. 2002) (quoting United States v. Cohen, 518 F.2d 727, 733 (2d Cir. 1975) (citation modified)); see also Khalupsky, 5 F.4th at 294 ("In sum, although not specifically pleaded in the indictment, [the evidence in question] [is] plainly within the charged core of criminality" and "simply served as additional examples of the same conduct constituting the charged scheme." (citation modified)).

### ii.    Arianna's Testimony

Arianna testified she was addicted to drugs, and to support her habit and "to avoid being dope sick at all costs," she began to prostitute in approximately 2017.  (Tr. 342-44.)  At that time, Arianna was making the decisions as to how many clients she would see, and she kept all the money she made from that work.  (Id. 344.)  Arianna initially met the Defendant in approximately 2017 or 2018 as her drug dealer. (Id. 344-45.)  However, Arianna was facing homelessness, and Johnson proposed "put[ting] [her] to work," which she eventually agreed to one day when she "really had nowhere else to go."  (Id. 346-47.)  The arrangement was that

53

Johnson would put Arianna in a hotel or motel, post her on Backpage, and give her drugs, all in exchange for Arianna giving him the money she made from her dates. (Id. 347-48.) Arianna testified Defendant brought her to various hotels, including "one in Sayville." (Id. 348.) On cross-examination, when asked, "[y]ou didn't go to the Sayville Motor Lodge, right?", Arianna responded, "I can't remember"; when pressed further, Arianna clarified, "I'm saying I don't remember if I had been to the Sayville Motor Lodge prior to this." (Id. 364.) Arianna also testified that as part of her agreement with Defendant, "he could have his merchandise whenever he wanted it," meaning, she had to "put out to him before [she] could do anything else," which happened, because she "would be afraid to tell him no" especially since she knew Johnson carried a gun. (Id. 348-49.) Arianna explained she and her roommate, Bailey, another woman who worked for Defendant, were not allowed to spend the money they had because they had to give it to Defendant. (Id. 353-54.) Defendant would move them from one hotel to another, and they did not have a say in where they went. (Id. 354-55.) Arianna then testified about an incident in which she observed Defendant engage Bailey in anal sex while Bailey was experiencing some kind of kidney or urinary tract issue, which "sounded so painful" and "didn't sound like normal sex sounds." (Id. 359.) Arianna testified she heard Bailey crying in pain and Defendant grunting, moaning, and yelling at her to "take it." (Id.)

54

These observations made Arianna "scared" because "[Bailey] was a little girl; he's a big man" and "he hurt her . . . we talked about [it] after, and it hurt."  (Id. 359-60.)

Defense counsel argues Arianna's testimony is a constructive amendment because it expanded the nature of the conspiracy since the Government consistently repeated "the essence of the scheme charged in the grand jury – as can be seen by [] Johnson's co-defendants, who were all inextricably intertwined with SML – was a criminal agreement to make the SML a hub of commercial sex."  (Support Memo at 29.)  The Court is not persuaded by this argument.  While Arianna could not remember if she had "been to the Sayville Motor Lodge prior to this" (Tr. 364), she testified that one of the hotels where Defendant brought her to prostitute for him was in Sayville (see id. 348).  As stated supra, in the context of a conspiracy charge, "the Government need not set out with precision each and every act committed in furtherance of the conspiracy, particularly where the acts proven at trial were part of the core of the overall scheme and in furtherance of that scheme."  LaSpina, 299 F.3d at 182 (quoting Cohen, 518 F.2d at 733).  And as the Court also explained supra, "[i]n assessing sufficiency, we must view the evidence in the light most favorable to the [G]overnment, crediting every inference that could have been drawn in the [G]overnment's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight

55

of the evidence." Garcia, 2026 WL 817711 (citation modified). This Court finds that drawing every inference in the Government's favor, a rational juror could have found Arianna's testimony to show Johnson participated in a sex trafficking conspiracy at the SML, especially in light of other witnesses' testimony. Further, evidence must be evaluated "in conjunction" rather than by "piecemeal or in isolation" from other pieces of evidence. Klein, 913 F.3d at 78.

Moreover, the Second Circuit "consistently permit[s] significant flexibility in proof, provided that the defendant was given notice of the core of criminality to be proven at trial." Simpson, 227 F. App'x at 44 (citation modified). Here, Defendant was given notice of the core of criminality to be proven at trial. Defense counsel acknowledges the Government began to provide 18 U.S.C. § 3500 material to Defendant six weeks prior to trial. (See Support Memo at 26.) Additionally, based upon arguments made in Defendant's pre-trial motion in limine filed on September 29, 2025, Defendant knew of, at the least, the potential for testimony to be elicited from Arianna discussing her observations of Defendant having violent sex with Bailey. (See ECF No. 234 at 2-4.) However, Defendant claims the § 3500 disclosures "gave defense counsel no reason to assume that any witness would be unconnected to the SML." (Support Memo at 26.) As discussed supra, the Court disagrees

56

with Defendant's characterization that Arianna's testimony shows she was definitively "unconnected to the SML."

Furthermore, to the extent Defendant is raising the same argument he did at trial (see ECF No. 258) as to Arianna's testimony being impermissible under Federal Rule of Evidence 404(b), i.e., "Arianna's testimony appeared like an attempt by the [G]overnment to back-door inadmissible propensity evidence under Rule 404(b)(1). . . . [and even if] admissible, it constituted bad acts evidence offered without the required notice under Rule 404(b)(3)" (Support Memo at 27), the Court does not change its position on its rejection of that argument, which ruling the Court re-affirms and incorporates herein (see Tr. 190-91).  For convenience, the Court reiterates said ruling:

> First, the Court does not find [Arianna's testimony] to be 404(b) evidence, and that's consistent with my prior motion in limine [decision], and that's ECF No. 252 at pages 21 to 22.  This is because it is well settled in the Second Circuit that that evidence of uncharged criminal activity is not considered other [crimes] evidence under . . . Rule of Evidence 404(b) if it arose out of the same transaction or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial.

Id. (citing Forney II, 2025 WL 2208298, at *8 (quoting United States v. Carboni, 204 F.3d 39, 44 (2d Cir. 2000)).  The Court found Arianna's proffered testimony met that standard and now finds

57

Arianna's actual trial testimony also meets that standard. Additionally, even if, arguendo, Arianna's testimony did constitute rule 404(b) evidence, "the Second Circuit has adopted an 'inclusionary approach to evaluating Rule 404(b) evidence.'" See Forney II, 2025 WL 2208298, at *7 n.7 (quoting United States v. Edwards, 342 F.3d 168, 176 (2d Cir. 2003)).  The Court does so here.

Defense counsel also contends that "[b]y not instructing the jury as to the charged scope and nature of the conspiracy and allowing proof of criminal activity outside of the scope presented to the grand jury, the conspiracy charge was transformed into a sex trafficking scheme with anyone, at any place, on Long Island or within the Eastern District of New York."  (Support Memo at 29.)  A charge is deemed to be so altered either where "(1) an additional element, sufficient for conviction, is added, or (2) an element essential to the crime charged is altered." See Khalupsky, 5 F.4th at 293.  First, Defense counsel has not cited to any case law suggesting: (1) location is a legal element to be proved for a sex trafficking conspiracy charge; and/or (2) a court must instruct a jury as to such location and scope, as he continues to propose.  (See Support Memo in toto.)  The Court is also not aware of any such precedent.

Second, the Court's jury charge included the exact language from Count One of the Revised Trial Indictment.  (Compare

58

Revised Trial Indictment ¶ 1, with Court's Jury Charge at Tr. 882-83.)  The Court's jury charge also extensively discussed the elements the Government needed to prove beyond a reasonable doubt for the jury to convict the Defendant of conspiracy.  (Compare Court's Jury Charge at Tr. 873-80 ("First, that as charged in the indictment, two or more persons entered into an unlawful agreement to engage in sex trafficking; and, second, that the defendant knowingly and willfully became a member of a conspiracy. I will explain each element in detail. . . ."), with United States v. Mahaffy, 693 F.3d 113, 123 (2d Cir. 2012) ("To prove conspiracy, the government must show that the defendant agreed with another to commit the offense; that he knowingly engaged in the conspiracy with the specific intent to commit the offenses that were the objects of the conspiracy; and that an overt act in furtherance of the conspiracy was committed." (quoting United States v. Monaco, 194 F.3d 381, 386 (2d Cir. 1999))); see also Khalupsky, 5 F.4th at 288 (2d Cir. 2021) ("To prove conspiracy, the government must show that two or more persons entered into a joint enterprise for an unlawful purpose, with awareness of its general nature and extent. It must show that each alleged member agreed to participate in what he knew to be a collective venture directed toward a common goal." (citation modified)).  Thus, no element of the offense charged was modified here.

59

Third, the Government did not attempt to expand the scope or theory of the conspiracy in any way: not through its witnesses; not through other evidence it presented; and, not through its opening or closing arguments.  Aside from Cynthia's and Arianna's testimony, discussed and analyzed supra, Defendant references just two other instances to support this allegation.  (See Support Memo at 27-28.)  Both of these instances were not only outside the presence of the jury, but also involved arguments before the Court about legal issues relating to the elements of conspiracy, of which, location is not one. (See Tr. 179-91; see also id. 694-96.)[10]

Last, the Court finds the case law Defendant cites to be inapposite.  Stirone v. United States is a 60-year-old case involving an interstate commerce issue.  361 U.S. 212, 217 (1960).  And, in United States v. Milstein, the Government "return[e]d to the Grand Jury to obtain [a] second superseding indictment adding the interstate commerce allegation to other counts" and "presented testimony regarding the contamination evidence to the grand jury," but the Government did not "secure an amendment to Count Three of

---

[10]  The Court did not take "an expansive view of the conspiracy," as the Defendant alleges.  (See Support Memo at 27.)  The Court was commenting on what the plain language states on the face of the Superseding Indictment, which cannot be disputed. See Superseding Indictment ¶ 1 ("In or about and between 2014 and November 2022, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere . . . .").  In context, it is apparent the Court's statement regarding location being a "minor issue" (see Tr. 188) was made with respect to the fact that location is not an essential element to prove conspiracy.

the indictment to allege that the drugs had been misbranded because they were supposedly sterile when they were not." 401 F.3d 53, 64 (2d Cir. 2005). Yet, nonetheless, the Government was "allowed to present evidence of the contamination" at trial, and the court instructed the jury it could find the defendant guilty of that count if "the labeling of the ampules of saline diluent suggested untruthfully that these ampules were sterile . . . when in fact they were a danger to health," which, the defendant argued, and the Second Circuit agreed, constructively amended the indictment by allowing the jury to convict him of misbranding on the basis of the contamination evidence. Id. at 64-65. ("The Government seemed to have recognized this when it presented the contamination evidence to the grand jury in the course of obtaining the amendment alleging the jurisdictional element. However, the Government neglected to have Count Three amended to include the contamination allegation.") There are no such circumstances present in the instant action.

Upon the instant record, therefore, the Court finds there was no constructive amendment of the Superseding Indictment.

### b. No Variance

A variance occurs "when the charging terms of the indictment are left unaltered, but the evidence at trial proves facts materially different from those alleged in the indictment." United States v. Lebedev, 932 F.3d 40, 54 (2d Cir. 2019), abrogated

61

on other grounds by Ciminelli v. United States, 598 U.S. 306, 143 (2023) (quoting United States v. Dove, 884 F.3d 138, 149 (2d Cir. 2018)).  "The most significant difference between a variance and a constructive amendment is that the latter is a per se violation of the Fifth Amendment, whereas 'a defendant must show prejudice in order to prevail on a variance claim.'"  Kenner I, 2019 WL 6498699, at *10 (quoting United States v. Frank, 156 F.3d 332, 338 n.5 (2d Cir. 1998)).  "A defendant fails to show that he has been prejudiced by the variance when 'the allegation and proof substantially correspond, where the variance is not of a character that could have misled the defendant at the trial, and where the variance is not such as to deprive the accused of his right to be protected against another prosecution for the same offense.'"  Id. (quoting United States v. Mucciante, 21 F.3d 1228, 1236 (2d Cir. 1994)).  To warrant reversal, a defendant must demonstrate "that substantial prejudice occurred at trial as a result" of the variance.  Khalupsky, 5 F.4th at 294 (quoting Dove, 884 F.3d at 149).

Defendant makes the same arguments for variance as he did in support of his constructive amendment.  He contends that "the testimony of Arianna and Cynthia, who were not alleged victims of substantive sex trafficking counts and who were involved in conduct almost entirely separate and apart from the SML, constituted a variance" because "[s]uch evidence was inconsistent

62

with the [G]overnment's long-standing theory of the conspiracy, and the testimony significantly prejudiced [Defendant], who lacked notice, until midway through the trial, that the nature of the conspiracy had greatly expanded." (Support Memo at 28-29.) For the same reasons stated supra in Section II.B.1.a, the Court finds these arguments to be without merit. There is no variance here, as the evidence at trial did not prove facts materially different from those alleged in the Indictment. And even if there was, Defendant was not substantially prejudiced. See Khalupsky, 5 F.4th at 294 ("For the reasons discussed in the context of constructive amendment, we do not think that the evidence [defendant] points to 'materially differe[d]' from what was alleged in the superseding indictment" and he also cannot demonstrate "substantial prejudice" because "[t]he superseding indictment itself put [defendant] on notice of much of the evidence about which he complains. To the extent he had not been on notice of every piece of [evidence], he was notified by the government's pretrial disclosures of exhibits about [the evidence] it intended to rely upon . . . .").

Further, the cases Defendant cites are not analogous to his case. United States v. San Juan is a 50-year-old case where the defendant was convicted of the crime of willfully transporting "into the United States monetary instruments exceeding $5,000 without filing a report thereof." 545 F.2d 314, 314 (2d Cir. 1976). Defendant relies upon this case for the proposition that the

"prosecution and defense focused on the bus as the location of the crime" but the "charge permitted the jury to convict even if it found that the crime occurred after the defendant got off the bus." (Support Memo at 24.)  The reason the court reversed the judgment of conviction and dismissed the information was because it found "in order to prove willfulness, the Government should make some effort to bring the reporting requirement to the traveler's attention" which was "concededly not done on the bus in this case" and it was "impossible to determine with any degree of certainty what her intent was with respect to the form." San Juan, 545 F.2d at 319-20.  The location mattered in San Juan because it was linked to the defendant's requisite intent, which was an element of the crime.  As already discussed supra, the location of a conspiracy is not an element of the crime, and regardless, there was no expansion mid-trial as Defendant alleges.  Additionally, Defendant tries to analogize to United States v. McDermott, but that case is readily distinguishable because the court there found a variance because of "prejudicial spillover due to joinder."  245 F.3d 133, 139 (2d Cir. 2001).  Here, by contrast, Johnson was tried alone with no co-defendants.

Thus, the Court finds there was no variance of the Superseding Indictment.  Therefore, Defendant's Rule 33 motion for a new trial on the grounds of a constructive amendment and/or variance is hereby DENIED.

2.   Johnson is Not Entitled to a New Trial Based on the Government's Rebuttal Summation

Johnson argues that a new trial is warranted because he was denied a fair trial due to the Government's "improper and inflammatory rebuttal summation" that "malign[ed] defense counsel" and "personally vouch[ed] for the strength of the [G]overnment's case."  (Support Memo at 29-37; see also Reply at 14-18.)  More specifically, Johnson takes issue with the Government:  (1) accusing defense counsel's strategy of "gaslighting" and "slut shaming" (see Support Memo at 31-32); (2) attempting to appeal to the jury by stating "[y]ou should be outraged by that argument[,] [h]ow dare he suggest that this was some messy workplace romance," and by "doubl[ing] down" after the Court's instruction to the jury by continuing his "inflammatory appeal to the jury's sense of outrage and direct[ly] comment[ing] on the integrity of the defense" (id. at 31); (3) improperly vouching for the credibility of the testimony and strength of the evidence by using the phrase "I submit," a first-person pronoun, "no fewer than 14 times" (id. at 32); and, (4) telling the jury "he was personally insulted by the defense and urged them to feel the same way" by saying "that argument is not only demeaning to the victims, but it's insulting to your intelligence and to mine" (id.).

To "prevail on a motion for a new trial based on prosecutorial misconduct, a defendant bears the 'heavy burden' of

65

demonstrating that the alleged misconduct is 'so severe and significant as to result in the denial of their right to a fair trial.'" United States v. Kenner, 272 F. Supp. 3d 342, 428 (E.D.N.Y. 2017) ("Kenner II") (quoting United States v. Locascio, 6 F.3d 924, 945 (2d Cir. 1993)). "'It is a rare case in which improper comments in a prosecutor's summation are so prejudicial that a new trial is required.'" United States v. Mangano, No. 22-861, 2025 WL 485381, at *2 (2d Cir. Feb. 13, 2025) (citation modified) (quoting United States v. Rodriguez, 968 F.2d 130, 142 (2d Cir. 1992)). "'[T]he Court must consider the probable effect the prosecutor's response would have on the jury's ability to judge the evidence fairly. In this context, defense counsel's conduct, as well as the nature of the prosecutor's response, is relevant.'" Id. at *2 (quoting United States v. Young, 470 U.S. 1, 12 (1985)). "'Inappropriate prosecutorial comments, standing alone, would not justify a reviewing court to reverse a criminal conviction obtained in an otherwise fair proceeding.'" Id. (quoting Young, 470 U.S. at 11).

To determine whether a prosecutor's alleged inappropriate remarks caused the required prejudice, a court "should consider 'the severity of the misconduct, the measures adopted to cure it, and the certainty of conviction in the absence of the misconduct.'" United States v. Mathieu, No. 16-CR-0763, 2019 WL 4267539, at *6 (S.D.N.Y. Sept. 10, 2019) (quoting United

66

States v. Truman, 688 F.3d 129, 144 (2d Cir. 2012)), aff'd, 2021 WL 1783122 (2d Cir. May 5, 2021).  "A new trial is appropriate 'only when the statements, viewed against the entire argument before the jury, deprived the defendant of a fair trial.'"  Id. (quoting United States v. Bermudez, 529 F.3d 158, 165 (2d Cir. 2008)).  The Court examines each of the statements that are the subject of Defendant's argument for prosecutorial misconduct in turn.

First, the Court is not convinced the prosecutor's references to defense counsel's theory as "gaslighting" and "slut shaming" was "so severe and significant as to result in the denial of [Defendant's] right to a fair trial."  Kenner II, 272 F. Supp. at 428.  The prosecutor initially used the word "gaslighting" when discussing the argument defense counsel made in his summation, which contended the victim witnesses were "reframing", "recreating history", and presenting "evolving narratives."  (Tr. 823; see also id. 780, 782-73, 787, 809.)  The prosecutor then argued: "The defense theory in this case has been to gaslight victims of sex trafficking."  (See id. 823 (emphasis added).)  It was while continuing to talk about this "centerpiece of the defense argument," when the prosecutor said, "to accept that argument, I submit, is to ignore all of the evidence . . . it's just slut shaming by a different name."  (Id. 823-24 (emphasis added).)  The prosecutor used the word "gaslighting" one last time at the end of

67

his rebuttal, stating, "[a]s you go back and begin your deliberations . . . think about this gaslighting." (Id. 826-27.) It is apparent, in context, that the prosecutor used the terms "gaslighting" and "slut shaming" to reply to defense counsel's prior arguments raised in his summation. As the Second Circuit has explained, "when viewed in context, [a] prosecutor's comment in [rebuttal] summation [i]s not improper [when] it '[i]s directed at the prior arguments of defense counsel.'" United States v. Barrow, No. 15—CR-1472, 2025 WL 1806466, at *8 (2d Cir. July 1, 2025) (quoting United States v. Bubar, 567 F.2d 192, 199 (2d Cir. 1977)); see also United States v. Duron, No. 22-CR-1559, 2023 WL 8253056, at *4 (2d Cir. Nov. 29, 2023) ("It is well settled that where the defense summation makes arguments and allegations against the government, the prosecutor may respond to them in rebuttal." (citation modified)); see also United States v. Marrale, 695 F.2d 658, 667 (2d Cir. 1982) ("[A] prosecutor is ordinarily entitled to respond to the evidence, issues, and hypotheses propounded by the defense[.]"). Furthermore, the Second Circuit has held "the [G]overnment may describe defense tactics as 'ridiculous,' 'distractions,' 'smoke screens,' 'distortions,' and 'game-playing' where the descriptions were an attempt 'to focus the jury's attention upon the evidence and away from defense counsel's claims.'" Mangano, 2025 WL 485381, at *2 (holding the prosecutor's statements that defense counsel was

68

"crafty" and "has a job to do" did not amount to prosecutorial misconduct (quoting United States v. Rivera, 971 F.2d 876, 883-84 (2d Cir. 1992))); see also United States v. Williams, 690 F.3d 70, 75 (2d Cir. 2012) (finding it was acceptable for the Government to argue defense counsel was "grasp[ing] at straws" and "attempt[ing] to take [the jury's] eyes off the ball"). Those aforementioned descriptions of defense counsel's tactics that the Second Circuit has found acceptable are comparable to the Government's use of the phrases "gaslighting" and "slut shaming" to describe defense counsel's theory here. Moreover, "[e]ven if we were to agree that the statements in this case were inappropriate, and we do not, they were plainly not severe enough to merit reversal." Mangano, 2025 WL 485381, at *2.

Second, the Court does not agree with Defendant that the prosecutor's remarks of "[y]ou should be outraged by that argument" and "[h]ow dare he suggest that this was some messy workplace romance", and the prosecutor's alleged "doubl[ing] down" after the Court's instruction to the jury by continuing his "inflammatory appeal to the jury's sense of outrage and direct[ly] comment[ing] on the integrity of the defense" amounted to prosecutorial misconduct. (See Support Memo at 31.) As this Court has explained previously, "defense argument may, in a proper case, 'open the door' to otherwise inadmissible prosecution rebuttal." Rivera,

69

971 F.2d at 883.   Here, such door-opening occurred; in his summation, defense counsel argued:

> We talked a bit earlier about how some of the women in recovery in this case have tried to reconstruct their histories, which reframe the relationships with [Defendant] . . .   These are the relationships formed between addicts, prostitutes, drug dealers, these are messy people and we should expect the relationships to be equally messy.   These people do, however, form relationships with each other because we often form relationships with the people we are around.   It's kind of like a really messed up workplace romance.

(Tr. 809 (emphasis added).)   Thus, the prosecutor properly made the challenged statements in reply to defense counsel's summation argument, which, when the door has been opened, a prosecutor is not barred from entering.   See United States v. Jaswal, 47 F.3d 539, 544 (2d Cir. 1995) (stating a "prosecutor is not precluded from vigorous advocacy, or the use of colorful adjectives, in summation" (quoting Rivera, 971 F.2d at 884)).

Additionally, although attorneys are generally barred from expressing personal beliefs or opinions to the jury, "the use of this form of expression is permissible if it clearly communicates nothing more than a comment on the evidence." Jaswal, 47 F.3d at 544 (citing United States v. Canniff, 521 F.2d 565, 571 (2d Cir. 1975), cert. denied, 423 U.S. 1059 (1976)).   In Jaswal, the Second Circuit stated, "[i]t was clear in the context, when the AUSA told the jury, 'I think you can conclude,' that he was

70

properly arguing the evidence and was not referring to his personal beliefs or to any additional information he might have had." Id. (citation modified).  Similarly, here, it is clear to the Court that when the prosecutor told the jury "you should be outraged," he was arguing about the evidence and was not referring to his personal beliefs or additional information of which he was in possession.  The first time the prosecutor said "you should be outraged by that argument" was immediately after he explained what it would mean if the jury was "[t]o accept that argument" of defense counsel.  (Tr. 825-26 (emphasis added).)  The second time the prosecutor used the challenged phrase, he said, "[y]ou should be outraged by this [D]efendant's efforts to convince you that these girls . . . didn't have the right to say no to him because of their own poor life choices," which was a rebuttal to the defense's interpretation of the evidence as stated in defense counsel's summation. (See id. 826 (emphasis added).)

        Moreover, defense counsel's accusation that "no curative measures were taken" by the Court and the Court was "unwilling[] to reign in [the AUSA]" is plainly incorrect.  (Support Memo at 36-37.)  As the Court just ruled supra, the statements Defendant objects to did not amount to prosecutorial misconduct. However, even if, arguendo, there was potential prejudice to the Defendant, the Court did not "do nothing" or refuse to "reign in" the prosecutor; instead, the Court issued an instruction to the jury

in the moment after defense counsel made his objection (see Tr. 826 ("Ladies and gentlemen, what the attorneys say is not evidence . . . listen to their arguments, but understand, they aren't necessarily evidence. . . I'll give you a charge.")), and shortly after summations, the Court gave the jury charge, which included instructions on what constitutes proper evidence (see Court's Jury Charge at Tr. 846-852).  Moreover, it is well-settled in this Circuit that "'[a]bsent evidence to the contrary, we must presume that juries understand and abide by a district court's limiting instructions.'"  United States v. Mahaffy, 446 F. Supp. 2d 115, 121-22 (E.D.N.Y. 2006) (quoting United States v. Downing, 297 F.3d 52, 60 (2d Cir. 2002)).  No such evidence to the contrary exists here.

Last, Defendant's reliance on United States v. Forlorma as "finding reversible error despite [the] district court's sustaining of objections and curative instructions" is misplaced. (Support Memo at 36-37.)  In Forlorma, the Circuit Court held that "in these confusing circumstances, we do not think these rulings and instructions were sufficient to undo the effect of the highly prejudicial inaccurate argument."  94 F.3d 91, 91, 95-96 (2d Cir. 1996) (emphasis added) (where, at oral argument on appeal, government conceded there was "no basis for [its] argument [at trial]", appellate court vacated judgment because the prosecution's series of arguments to the jury at trial "had no

72

basis in the evidence"). However, here, in contrast, there is no such "highly prejudicial inaccurate argument" which the Government conceded "had no basis in the evidence". (See id.)

Third, the Court does not agree the prosecutor "improperly vouch[ed]" for the credibility of the testimony and strength of the evidence by using the first-person-pronoun-phrase "I submit" "no fewer than 14 times." (Support Memo at 32.) As the Second Circuit has held, "[w]hile we have cautioned against excessive use of the personal pronoun, particularly insofar as it makes an issue of the prosecutor's credibility or implies the existence of extraneous proof, we have found acceptable a prosecutor's use of the phrases 'I submit that' and 'I think' when asking a jury to draw inferences based on common sense." United States v. Herredia, 153 F. App'x 50, 54 (2d Cir. 2005) (holding, in each identified instance, the prosecutor "was properly discussing the evidence and was not referring to his personal beliefs or any additional information he might have had"). As the Second Circuit did in Herredia, this Court concludes that in each instance identified here, the prosecutor was properly discussing the evidence and asking the jury to draw inferences based upon common sense, as opposed to referring to his personal beliefs or additional information he had. See United States v. Eltayib, 88 F.3d 157, 173 (2d Cir. 1996) (ruling "it clear" the prosecutor's use of "I submit" on numerous occasions was not improper because:

73

(1) defendant's lawyers "specifically attacked [a witness's] credibility and veracity in their summations" which "impugned the integrity of the government's case" and the prosecutor was therefore "entitled to respond with counter-arguments"; (2) statements following "I submit" either relied upon evidence or asked the jury to draw inferences based upon common sense to rebut the defense's theory; and (3) the phrase "I submit" did not express a personal belief, but an argument, which is the purpose of summation).

Fourth, Defendant claims the prosecutor's "[m]ost egregious[]" statement was telling the jury "he was personally insulted by the defense and urged them to feel the same way", stating "that argument is not only demeaning to the victims, but it's insulting to your intelligence and to mine." (Support Memo at 32). Defendant further claims the Second Circuit has "held it is improper for the [G]overnment to use the phrase 'insulting to the jury's intelligence.'" (Id. at 36 (citing United States v. Bagaric, 706 F.2d 42, 61 (2d Cir. 1983), abrogated on other grounds by Nat'l Org. for Women, Inc. v. Scheidler, 510 U.S. 249 (1994).)) However, Defendant misrepresents the Second Circuit's holding in Bagaric, which held:

> In sum, although we believe the Government would have been better advised to avoid entirely the use of words and phrases such as "lie," "preposterous," "sham," and "insulting to [the jury's] intelligence," its conduct

74

> here was largely responsive to the prosecutor-
> baiting tactics chosen by appellants, and
> involved almost exclusively characterizations
> of record testimony rather than appeals to
> Government expertise or extrinsic, unutilized
> evidence. Viewed in context, the Government's
> remarks constituted fair argument, and if
> errors were committed, they were neither
> significant nor did they prejudice appellants.

Bagaric, 706 F.2d at 61 (emphasis added). The Second Circuit did not hold it was unequivocally "improper" for the Government to use the phrase "insulting to the jury's intelligence," as Defendant alleges. Rather, the Second Circuit held the opposite: although it would have been better for the Government to refrain from using such a phrase, because the prosecutor was responding to defense counsel's tactics, and because the phrase involved contextual characterization of record testimony, it was a fair argument, and if errors were committed they were not significant or prejudicial. See id. Additionally, the Government conceded the phrase "insulting to your intelligence and to mine" was "not ideal," but not prejudicial (see Opp'n at 58), which tracks the Second Circuit's holding in Bagaric. This Court agrees.[11]

---

[11] To the extent Defendant argues that United States v. Friedman is "the most analogous case," this Court disagrees. (See Support Memo at 36.) In Friedman, "the prosecutor was urging the jury to ignore defense counsel's entirely legitimate role as an advocate," "repeatedly characterize[d] defense counsel as a 'witness' and his opening statement as 'unsworn testimony,'" and accused defense counsel of "mak[ing] any argument he can to get that guy off." 909 F.2d 705, 709 (2d Cir. 1990). The Second Circuit found the prosecution effectively invited the jury to conclude that "everyone the Government accuses is guilty, that justice is done

Finally, through its analysis of the above remarks, the Court has already examined and discussed "the severity" of those remarks, and "the measures adopted to cure" them, two of the three factors a court must consider while assessing whether the prosecutor's statements at issue caused substantial prejudice. See Mathieu, 2019 WL 4267539, at *6 (quoting Truman, 688 F.3d at 144), aff'd, 2021 WL 1783122. The third factor which remains for this Court to consider is "the certainty of conviction in the absence of the misconduct." Id. The Court finds the certainty of conviction in the absence of misconduct is definitively present here. The jury deliberated for almost three full days. (See ECF Nos. 267, 268, 271.) During said deliberations, it submitted many notes to the Court requesting: text messages between the Defendant and Seyforth, and between Seyforth and customers; more copies of the jury instructions; a legal definition of "pimping"; copies of Danielle's, Dawn's, Kristina's, Seyforth's, and Detective Darling's testimony; certain exhibits pertaining to registration cards at and photos of the SML; copies of stipulations the parties

---

only when a conviction is obtained, and that defense counsel are impairing this version of justice by having the temerity to provide a defense and to try to 'get' the guilty 'off'." Id. The Second Circuit found those statements directly attacked defense counsel because they were "grossly improper" and risked "a serious distortion of the jury's understanding of the roles of prosecutor and defense counsel." Id. at 710. However, there were no such remarks by the prosecution here; thus, there is no such concern present in this case.

entered into; images sent from Johnson's mobile phone of a woman holding an ID card; Seyforth's cooperation agreement; prostitution ads; photographs from Seyforth's mobile phone; voice notes sent from Johnson to Seyforth; and the definition of "power" as it is used in the definition of "force." (See ECF No. 272 (sealed).) Additionally, the jury did not convict Defendant of Count Three (sex trafficking of Kristina). (See ECF No. 273.) These requests and Defendant's acquittal on one of the counts after three days of deliberation demonstrates the jury's diligence and "abl[ility] to rely on the evidence adduced." Bagaric, 706 F.2d at 61, abrogated on other grounds by Scheidler, 510 U.S. 249 ("The jury's discriminating acquittal of four defendants (and partial acquittal of [of another defendant]) demonstrates it was able to rely on the evidence adduced."). Thus, the challenged statements made during the Government's rebuttal, when viewed against the entire argument before the jury, did not deprive Defendant of a fair trial. See Mathieu, 2019 WL 4267539, at *6 (quoting Bermudez, 529 F.3d at 165).

Therefore, the Court finds no prosecutorial misconduct. Accordingly, Johnson's Rule 33 Motion for a new trial based on assertions of prosecutorial misconduct arising from remarks made by the Government during its rebuttal summation is hereby DENIED.

77

\*\*\*

To the extent not expressly addressed herein, the Court has considered the Defendant's remaining arguments and finds that they are without merit.

<u>CONCLUSION</u>

For the reasons stated, **IT IS HEREBY ORDERED** that Johnson's Motion for a judgment of acquittal or, in the alternative, a new trial is DENIED in its entirety, with:

I.  Johnson's Motion for a Judgment of Acquittal pursuant to Federal Rule of Criminal Procedure 29 being DENIED for the following reasons:

   a. There was sufficient evidence to prove Johnson was part of the charged conspiracy to commit sex trafficking;

   b. There was sufficient evidence to prove Johnson used force, fraud, or coercion to cause Dawn and Ashley to engage in commercial sex work; and

   c. There was sufficient evidence to prove Johnson induced Ashley to travel in interstate commerce for the purpose of prostitution; and

II. Johnson's Motion for a New Trial pursuant to Federal Rule of Criminal Procedure 33 being DENIED for the following reasons:

78

a. There was no expansion of the scope of the conspiracy at trial and therefore no prejudicial variance or constructive amendment; and

b. Johnson was not denied a fair trial by the Government's rebuttal summation.

SO ORDERED.

/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated: April 3, 2026
       Central Islip, New York